JUNE TERM 1844.

ELIZABETH CASEY'S LESSEE *vs.* WILLIAM INLOES, JOSHUA
INLOES, JAMES HOOPER, JONATHAN CHAPMAN, AND WIL-
LIAM TYSON.—*June Term 1844.*

A prevalent opinion, in the neighborhood of the premises claimed in an action
of ejectment, even if known and adopted by the lessor of the plaintiff, as to
her legal rights, whether founded in error or not, does not, at law, prevent
the running of the statute of limitations, nor repel the legal presumption of
a grant arising from long continued, and acquiesced in, adverse possession.

A certified copy of the rent-roll, extracted from the debt books of the Lord
Proprietary, under the hand and seal of the Register of the Land office, hav-
ing relation to the possession of the tract of land claimed in an action of eject-
ment, is competent evidence for the defendant in all cases of controverted
possession, or when possession is relied on as evidence for the presumption
of a grant.

The rent-rolls are books which were kept in the several counties of the State,
during the Proprietary Government, by officers called rent-roll keepers, and
were designed to show, in the respective counties, the grants of land made
by the Lord Proprietary, the names of the subsequent alienees thereof, of
those who were in possession of the same, and the quit-rents with which
they were chargeable.

An escheat patent is conclusive evidence of the fact of an escheat grant.

Extracts from the rent-rolls may tend to disprove possession under an escheat
patent, in a particular person, at a given period, by *not* showing that such
person, at such period, was in possession, nor that quit-rents were charged
to him on account of such escheated lands, as also by showing that others
were charged therefor.

Where a tract of land was patented in 1663, and no conveyance from the pa-
tentee, but a deed for the same land in 1685 was in proof, from *W.* to *J.*, and
another deed for the same tract in 1689, from *B.* to *T.*, with proof of title,
from *T.* to the lessor of the plaintiff, who brought her action of ejectment
in 1841, but no evidence that *W.*, *J*, or *B.* had ever been in possession, or
how *W.* or *B.* acquired or claimed title, the court cannot be called upon to in-
struct the jury that they are bound to presume a deed from the *patentee* or
those claiming under him, to *W.*, or from *J.* to *B.* or his ancestor, for such
tract of land; though it would have been competent to have required an in-
struction to the jury that they must presume a deed from the patentee, or
those claiming under him, to *B.*, from whom the paper or record title was
perfect.

A continuous possession of twenty years or upwards, in a party, or those
claiming under him, will authorise him or them to supply the absence of a
conveyance to such party from one seized before him, by requiring the court
to instruct the jury to presume such a conveyance.

No direct proof of possession in a given party can be reasonably expected after
a lapse of one hundred and fifty years.

Casey's lessee *vs.* Inloes, et al.—1844.

The certificate of the surveyor of the county, made in 1698, that a tract of land began at a bounded white oak, standing in the *line of a parcel of land* formerly belonging to *M.*, "*and now in the possession of the aforesaid T.*," returned to the land office about nine years after a deed to *T.*, is evidence of *T.'s.* possession of the land referred to as formerly belonging to *M.*

So proceedings in ejectment, commenced in 1704, by *C.* against *H.*, the grantee of *T.*, in which the premises sued for were described as *late in the tenure and occupation of T.*, and the lessor of the plaintiff, recovered judgment upon title derived from *H.*, are evidence that *T.* had been in possession, is confirmatory of the surveyor's certificate, and that *H.* was in possession at the institution of the suit.

A recital in a deed, dated in 1756, professing to be made by the son and heir-at-law of one joint tenant, conveying land to the surviving joint tenant, and declaring that he "now continues as survivor, seized, and yet is actually seized of such lands," is evidence in 1843, that such survivor was possessed at the date of the deed.

Where a plaintiff in ejectment deduces a regular paper title from two grantors, the possession of either, the other necessary circumstances concurring, will enable him to ask the presumption of a conveyance to the party in possession.

It is not universally true that possession of land is a matter of fact which must be proved by the same kind of testimony requisite for the proof of any other fact or occurrence.

Possessions of modern date, susceptible of proof by living witnesses, may be within the general rule; but as to those of such antiquity, that the brevity of human life demonstrates that such proof cannot be had, these are not within the rule.

Certificates of public surveyors, entries in debt books, recitals in deeds of ancient date, are evidence to prove ancient possession of lands.

Facts of great antiquity, resting wholly in parol, of which no written evidence can be presumed to exist, may be established by hearsay evidence.

A plaintiff in ejectment, who claims title under two grantors, is not estopped from setting up the paramount title of the one, or alleging that he derived no title from the other.

The true principle of estoppel, as applicable to deeds, is to prevent circuity of action, and to compel parties to fulfil their contracts; thus, a party in a deed asserting a particular fact, and thereby inducing another to contract with him, cannot, by a denial of that fact, compel the other party to seek redress, against his bad faith, by suit; but the court will decide upon the rights of the parties, without subjecting them to the expense and delay of a new litigation; and this they will do, not on the ground of concluding the parties from showing the truth, but because the whole truth being shewn, the justice of the case is not changed.

The general principle is well established, that possession of a part of a tract or parcel of land, by him who is legally entitled to the entirety, carries with it possession to the extent of his legal rights; and no wrong-doer can, in contemplation of law, by entry, or the exercise of acts of ownership thereon,

acquire the possession of any part thereof, but by actual enclosure, or ouster, actual or presumptive.

The grounds on which the presumption of a deed rests at law, are, that the rightful owner has so long submitted to acts of ownership over his property, exercised by another, without ever having sued for the recovery of his property, or damages for the unlawful invasion of his rights, that he is presumed to have granted them to him, by whom the acts of ownership are exerted.

By the act of 1745, ch. 9, sec. 10, "all improvements, of what kind soever, either wharfs, houses, or other buildings, that have or shall be made out of the water, or where it usually flows, (as an encouragement for such improvers,) be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever." In the year 1698, a patent issued for a parcel of land called *M's Neck*, lying in *Chesapeake Bay*, and on the *N.* side of a river called *Patapsco*, and on the *N.* side of the *N. W.* branch of said river : Beginning at a marked red oak by a little branch, and running up along the *N. W.* branch, for breadth, *W. N. W.* 100 p. over a cove unto a marked white oak, &c. HELD :

*1st.* That the patentee of this land, and those claiming under him, had by virtue of the act of 1745, a mere privilege of acquiring property by its reclamation from the water; that until reclaimed, she had no property; no possession; no right, under that act.

2nd. That a party, by erecting a fence for thirty years and upwards, on a part of the low gounds adjacent to such tract designated as the cove, in front of that part of *M's Neck* claimed by the plaintiff, which was covered by the flow of the tide, and claiming below it, did not furnish evidence of such an uninterrupted, continuous possession, as was essential to the presumption of a grant to the person making and extending such fence.

3rd. That being erected on navigable water, without the limits of the land owned by the patentee, it gave him no right of action.

4th. That ejectment would not lie, there being no title in the land.

5th. That trespass, in which the law implies an injury, whether sustained or not, could not be maintained for want of ownership in the soil.

6th. A party in possession of land adjacent to a navigable stream, who runs a fence from his land into the stream, across the front of another adjacent proprietor, gains no possession by such an act, which is in itself a trespass.

The principle, that where one stands by and sees another laying out money upon property, to which he has himself some claim or title, and does not give notice of it, he cannot afterwards in equity and good conscience, set up such claim or title, does not apply to an act of encroachment on land, the title to which is equally well known, or equally open to the notice of both parties; but the principle applies only against one, who claims under some trust, lien or other right, *not* equally open and apparent to the parties, and in favor of one who would be misled or deceived by such want of notice.

Where defence is taken on warrant of resurvey, all possessions, whether relied on to prove title, for illustration, or to disqualify witnessses examined on the survey, must be located on the plots of the cause.

Where several defendants, in an action of ejectment, claim title to several and distinct parcels of the land sued for, as by separate and independent leases,

Casoy's lessee *vs.* Inlocs, et al.—1844.

and there is no evidence to show any possession in any person under whom two or more of the defendants claim to derive title, a presumption of a grant, founded on the possession of the claimant of one lot, cannot enure to the benefit of the claimant of a separate and distinct lot, of which no such possession had ever been held.

The presumption of a grant is an inference of law arising out of particular facts, and may exist, although the jury, in their consciences, may disbelieve the actual execution of any such grant.

A prayer made in such form or terms that it would have a tendency to mislead the jury, as in the necessity of finding as a fact, what is an inference of law, should not be granted.

In a case where a jury may be authorised to presume a grant to defendants in possession, such presumption may be made, either of a grant from the plaintiff, or from any person under whom the plaintiff derived title, according to the proof.

Upon every discontinuance of the possession of a wrong-doer, by operation of law the possession of the rightful owner is restored, and nothing short of an actual adverse and continuous possession for twenty years can destroy his right, or vest a title in the wrong-doer.

When a court as an inference of law, arising from proof of possession, directs a jury to presume a deed, it is done upon principles of public policy, for the protection of ancient possessions.

All that the law requires to raise the presumption is, that the possession should have been actual, adverse, exclusive, and continuous, and under claim of title.

A party cannot call upon the court to instruct the jury where defence is taken on warrant, as to the effect of a patent not located upon the plats, nor given in evidence to the jury.

The court cannot be called upon to say that an original patent must be construed by reference to its relation to another patent, founded on a resurvey of the same land, where the second patent did not appear in evidence, and where the same parties claimed under both patents.

Upon an escheat the State takes as the *ultimus hœres* of that, to which, the person was entitled, whose death, without heirs, created the escheat.

An escheat grant, in one sense of the term, is the creation of a *feudum novum ;* the grantee takes the property granted as a new fief or feud, so far as regards his relationship, obligations, and duties to the *State,* and the estate, upon the terms specified in the grant.

But the limits, privileges, appurtenances, and priorities of the estate granted by escheat patent, and the liens and incumbrances to which it may be subjected, exist independently of the inquiry, whether the grant be of an ancient or a new feud.

The State acquires by escheat, not only that which was originally granted, but all the rights, privileges, priorities and appurtenances incident to the land itself, and with which it was held by the person who died seized without heirs.

The escheat grantee, upon the terms specified in his grant, takes the estate granted in the same condition in which it may have devolved on the State, ex-

cept so far as it may be affected by the doctrine of merger or extinguishment.

An escheat grant relates to the original grant, and passes to the escheat grantee all that passed to the original grantee, and which was held by him, whose death, without heirs, occasioned the escheat.

The relation of the escheat grant to the original grant is not intercepted by an intermediate patent, unless, at the time of granting the same, the escheat right had accrued.

Until the occurrence of the event which constitutes the escheat, the interest of the Lord Proprietary in relation to it, was a mere possibility, and could not be the subject of a grant.

The doctrine of estoppel does not apply to grants made by the State. They only pass the title which the State had at the time of the grant, and not that subsequently acquired.

An escheat grant is *prima facie* evidence that the land granted is liable to escheat, at the date of issuing the escheat warrant, and not antecedently.

*M.* was patented in 1663. In 1734, *J.,* including a part of *M.,* was also patented, and in 1737 an escheat warrant and patent issued for *M.* The two last patents were granted to *F.,* under whose devisee, the plaintiff claimed *M.* by his deed of 1758. HELD: that the conveyance passed *M.,* as it was held under the original patent of 1663, be the effect of the patent of *J.* what it may.

As far as regards any conflict of rights *between the parties to this cause,* the defendants, under the act of 1745, had a right to extend westwardly in front of their lots to the west side of *Caroline* street and no further; and the lessor of the plaintiff had a right to extend her grounds to the City Dock, on the south side of *Lancaster* street.

A grant, though for the most part covered with water, still passes to the grantee all the soil under the water, included within its outlines, with all the rights of property incident thereto, subject only to the rights of the public as to fishing and navigation. If encroached on, the grantee may maintain trespass or ejectment.

The act of 1745, ch. 9, never was designed to give one land-holder the power of extending his improvements over the land of another.

The right of the riparian proprietor to extend his improvements into the water, is intercepted by a grant from the State to another person of the land covered by the water of a navigable stream, over which such proprietor might otherwise have been entitled, under the act of 1745, to make improvements.

The heir of lessee for a term of years of a lot bordering on the water, under the act of 1745, ch. 9, sec. 10, is not the riparian proprietor of such lot.

Where possession was essential to the acquisition of title to land, and title to the creation of a riparian right, any prayer founded on that right, which did not submit the fact of possession to the jury, should be rejected.

APPEAL from *Baltimore* County Court.

This was an action of *Ejectment*, commenced by the appellant on the 20th August 1841, who declared for all that lot or piece of ground on *Fell's Point*, in the city of *Baltimore:* Beginning for the same at the south-west intersection of *Alice Anna* street and *Caroline* street, and running westerly on *Alice Anna* street one hundred and seventy feet to *Spring* street, (formerly *Petticoat* alley,) and then southerly, bounding on the east side of *Petticoat* alley, or *Spring* street, to the water of the dock commonly called the *City Dock*, then easterly bounding on the water of said dock to *Caroline* street, then northerly bounding on *Caroline* street to the beginning, containing one and an half acre of land, more or less, with the appurtenances, situate and being in *Baltimore* county aforesaid, which *Elizabeth Casey* had demised, &c.

The defendants pleaded not guilty, and took defence under the warrant of resurvey for all the land lying between the west side of *Caroline* street and the east side of *Spring* street, and the south side of *Alice Anna* street and the north side of *Lancaster* street.

1st EXCEPTION. At the trial of this cause the plaintiff to support the issue on her side, offered in evidence the following papers, to wit:

A patent granted by the *State of Maryland* to *Alexander Mountenay* for *Mountenay's Neck*, dated 30th June 1663.

A deed from *Robert Blunt* to *James Todd*, 4th October 1695.

A deed from *James Todd* to *John Hurst*, of the 3rd March 1701.

A deed from said *Todd* to *Charles Carroll*, of the 16th June 1701.

And the deed of mortgage from *John Hurst* to *Richard Colegate*, of the 13th October 1702.

A deed from said *Hurst* to *Thomas Sheridine*, *Thomas Sligh*, of the 19th March 1749.

The will of *Richard Colegate*, 8th of August 1721, devising *Mountenay's Neck* to his two sons, *John* and *Thomas Colegate*.

A deed from said *John* and *Thomas Colegate* to *Thomas Sheridine* and *Thomas Sligh*, of the 15th November 1750.

A deed from *Thomas Sheridine* to *Thomas Sligh*, of the 26th June 1756.

A deed from *Charles Carroll* to *Thomas Sligh*, of the 31st May 1759.

A deed from *Thomas Sligh* to *Thomas Hammond*.

The grant of *Alexander Mountenay* for 200 acres in *Patapsco* river, *Mountenay's Neck*, described the land as follows, to wit:

A parcel of land called "*Mountenay's Neck*," lying in *Chesapeake Bay*, and on the north side of a river called *Patapsco*, and on the north side of the north-west branch of the said river: Beginning at a marked red oak by a little branch, and running up along the north-west branch, for breadth, west-north-west one hundred perches over a cove unto a marked white oak, by a line drawn north-north-east running into the woods, for length, three hundred and twenty perches by a line drawn from the said north-north-east line, running east-south-east one hundred perches, by a line from the said east-south-east line running south-south-west unto the first marked red oak three hundred and twenty perches, containing and now laid out for two hundred acres, more or less; together with the rights, profits and benefits thereunto belonging, (royal mines excepted.) To have and to hold the same unto him the said *Alexander Mountenay*, his heirs and assigns forever, &c.

ROBERT BLUNT *to* JAMES TODD, IN FEE. This indenture describes the land as all that parcel of land called "*Mountenay's Land*," lying on the north side of the *Patapsco* river, in the Province aforesaid: Beginning at a marked red oak, by a little branch, and running up the north-west branch west-north-west one hundred perches, over above to a marked white oak standing on a point, then running north-north-east into the woods three hundred and twenty perches, then running east-south-east one hundred perches, then running south-south-west three hundred and twenty perches to the first marked tree, for two hundred acres of land, more or less; together with all the profits, rights and benefits thereunto belonging, or in any wise appertaining. To have and to hold, &c.

JAMES TODD *deed to* JOHN HURST. This indenture describ-
ed the land conveyed by it in fee as one hundred and thirty-five
acres and one half of one acre of land, being part of a certain
tract or parcel of land called and known by the name of "*Cole
Harbour*," lying and being in the county aforesaid; and also
one hundred sixty and four acres and one half of an acre of
land, being part of another tract or parcel of land formerly
belonging to *Alexander Mountenay*, late of the aforesaid county
and province, deceased, and purchased by the said *James Todd:*
Beginning at a bounded white oak on a point, being the first
bounded tree of *Cole Harbour*, by the north-west branch, and
running down the river or branch east-south-east, for breadth,
one hundred and forty perches to a locust post on a little point,
and then with a line drawn north-north-east with the line of
*Mountenay's* land, for length, two hundred and twenty-four
perches to a bounded white oak standing in the said line, then
with a line drawn west-north-west one hundred and forty per-
ches to a red oak standing in the north-north-east line of the
said land of *Mountenay's*, then running with the said land
south-south-west fifty-six perches to a white oak, then with a
line drawn north-west, two degrees south, for the length of
two hundred and four perches to a gum tree standing near the
said branch, then with a line drawn south-south-west seventy-
five perches to a white oak standing in the corner of the old
field by the falls or branch aforesaid, then with a line drawn
south-east and by south to the said branch, and with the said
branch south-east and by south to the first bounded tree, sur-
veyed and laid out for three hundred acres of land, more or
less, to be holden of the manour of *Baltimore;* together, &c.

JAMES TODD *deed to* CHARLES CARROLL. This indenture,
made the sixteenth day of June, in the year of our Lord one
thousand seven hundred and one, between *James Todd* of *Bal-
timore* county, gentleman, and *Penelope* his wife, of the one
part, and *Charles Carroll* of *Anne Arundel* county, gentleman,
of the other part. Whereas the above said *James* is seized in
fee simple of three several tracts of land, all lying in *Balti-
more* county, one called *Todd's Range*, and originally laid out

for five hundred and ten acres; another called *Mountenay's Neck*, containing two hundred acres, and the third called *Bold Venture*, containing one hundred and sixty acres, all of which said tracts or parcels of land are contiguous one to another. And whereas the said *James* has covenanted with one *John Hurst*, of the said county of *Baltimore*, to convey and make over unto him and his heirs, one hundred and fifty acres out of the said tract called *Mountenay's Neck*, and one hundred acres out of the said tract called *Todd's Range*.

Now this present indenture witnesseth, that the said *James* and *Penelope* his wife, &c., have given, &c., the said *Charles Carroll*, and his heirs, *all that the remaining part of the said tract of land called Mountenay's Neck*, as also all that the remaining part of the said tract called *Todd's Range*, as also all that entire tract called *Bold Venture*, with all, &c. To have and to hold the said remaining part of the said two tracts called *Mountenay's Neck* and *Todd's Range*, as also all that entire tract called *Bold Venture*, with all and singular the appurtenances thereunto belonging, or in any wise appertaining, unto him the said *Charles Carroll*, his heirs and assigns forever, &c.

JOHN HURST *mortgage to* RICHARD COLEGATE of one hundred thirty-five acres and one half part of an acre of land, being part of a certain tract or parcel of land called and known by the name of *Cole Harbour*, lying in the county aforesaid; and also one hundred sixty and four acres and one half part of an acre of land, being part of another tract or parcel of land formerly belonging to one *Alexander Mountenay*, late of the aforesaid county and province, deceased, and purchased by *James Todd* of the aforesaid county, gentleman: Beginning at, &c.

JOHN HURST *conveyance to* THOMAS SHERIDINE AND THOMAS SLIGH. This indenture, made the nineteenth day of March, seventeen hundred and forty-nine, between *John Hurst* of, &c., of the one part, and *Thomas Sheridine* and *Thomas Sligh* of, &c., of the other part, witnesseth, that the said *John Hurst*, for, &c., by these presents hath given, granted, &c., unto them the said *Thomas Sheridine* and *Thomas Sligh*, their

heirs and assigns, one hundred thirty-five acres of land and one half part of one acre of land, being part of a tract of land called and known by the name of *Cole's Harbour*, lying in the county aforesaid; and also one hundred sixty-four acres and one half part of an acre of land, being part of another tract or parcel of land formerly belonging to one *Alexander Mountenay*, late of the county and province aforesaid, deceased, and purchased by *James Todd* of said county, gentleman: Beginning at, &c.

The will of *Richard Colegate*, dated 8th August 1721, and proved 6th February 1721, devised as follows:

And I also give my said sons *John* and *Thomas*, three hundred acres of land, being part of *Cole's Harbour* and *Mountenay's*, (which land I had of *John Hurst*,) and all the houses, orchards and corn fields to them, or either of the said tracts, belonging, to be equally divided between them and their heirs and assigns forever.

JOHN COLEGATE AND THOMAS A. COLEGATE *conveyance to* THOMAS SHERIDINE AND THOMAS SLIGH, dated 15th Nov. 1750, for the land mentioned in their father's will, in fee.

THOMAS SHERIDINE *to* THOMAS SLIGH. *To all to whom these presents shall come, greeting:* Whereas, a certain *John Colegate* and *Thomas Colegate* did, by indenture bearing date on or about the fifteenth day of November, in the year one thousand seven hundred and fifty, and made, or mentioned to be made, between the said *John Colegate* and *Thomas Colegate* of the one part, and *Thomas Sheridine's* late father, deceased, a certain *Thomas Sligh* of the other part, for and in consideration of one hundred pounds, sterling money, to them the said *John Colegate* and *Thomas Colegate* in hand paid, at or before the sealing and delivery thereof, grant, &c., unto them the said *Thomas Sheridine* and *Thomas Sligh*, their heirs and assigns forever, all that part of two tracts or parcels of land called *Todd's Range* or *Cole's Harbour* and *Mountenay's Neck*, situate, &c.: Beginning for the part thereby conveyed or mentioned, or intended to be, of the aforesaid tract or parcel of land, at a bounded white oak on a point, being first bounded

tree of *Cole Harbour*, by the north-west branch, and runs down the river or branch east-south-east, &c. And whereas, my said late father, *Thomas Sheridine*, after being jointly with the aforesaid *Thomas Sligh*, by virtue of the conveyance afore-said, seized and possessed of the aforesaid piece or parcels of land hereby conveyed, or mentioned so to be thereof, on or about the 29th day of May, 1752, died so seized and possess-ed, living the aforesaid *Thomas Sligh*, who survived my said late father, and who now continues as survivor, seized, and yet is actually possessed of the aforesaid three hundred acres of land. And whereas, 1 am eldest son and heir-at-law of the said *Thomas Sheridine*, deceased, for which reason the said *Thomas Sligh* is desirous of having conveyed to him my right or claim which I may have to the said three hundred acres of land, so as aforesaid conveyed. Now know ye, that I, *Thos. Sheridine*, son and heir of the aforesaid *Thomas Sheridine*, deceased, for and in consideration of the sum of fifty pounds, sterling money, by the said *Thomas Sligh* to me in hand paid, have remised, released and forever quit-claim unto him the said *Thomas Sligh*, his heirs and assigns forever, all that the afore-said three hundred acres of land.

Charles Carroll *deed to* Thomas Sligh, 150 *Acres, part of Mountenay's Neck and Todd's Range.* This indenture, made the thirty-first day of May, in the year of our Lord one thousand seven hundred and fifty-nine, between *Charles Car-roll*, of the city of *Annapolis*, in *Anne Arundel* county, esq., of the one part, and *Thomas Sligh*, of *Baltimore* county, mer-chant, of the other part, witnesseth ; whereas *Charles Carroll, Esq.*, late of the city of *Annapolis* and county of *Anne Arun-del* aforesaid, deceased, by his last will and testament in wri-ting, bearing date the 1st day of December 1718, amongst other things therein contained, bequeathed all his lands in *Baltimore* county to his sons *Charles* and *Daniel*, as also all his mort-gages, as by the said will, duly proved and recorded, may appear. And the said *Daniel Carroll*, by his last will and testament in writing, bearing date the 12th day of April, 1734, did will and authorise *Charles Carroll*, party to this deed, to

sell all his lands which should not in any one tract exceed five hundred acres, as by the said will and testament duly proved and recorded may appear.

Now this indenture witnesseth, that the said *Charles Carroll*, for, &c., to him in hand paid by the said *Thomas Sligh*, &c., unto him the said *Thomas Sligh*, his heirs and assigns, all the northermost end of a tract of land called *Mountenay's Neck*, beginning at the end of two hundred and twenty-four perches in the eastermost line of the said land, and running thence north-northeast seventy-six perches; then west-north-west one hundred and forty perches; then south-south-west seventy-six perches; then east-south-east one hundred and forty perches to the beginning. And all that part of *Todd's Range*, except thirteen and a half acres, which he hath already agreed to exchange with the said *Thomas Sligh*, beginning at the end of the south-south-west seventy-six perches course, of part of *Mountenay's Neck* above mentioned, and running thence south-south-west fifty-six perches; then north-west one hundred and forty perches; then east one hundred and forty perches to *Mountenay's Neck*; then to the beginning, containing one hundred and fifty acres, more or less; together with all the rights, profits, benefits, privileges and appurtenances thereunto belonging or in any wise appertaining. To have and to hold unto him the said *Thomas Sligh*, his heirs and assigns forever.

THOMAS SLIGH *deed to* THOMAS HAMMOND, 14$\frac{1}{4}$ a. pt. *Mountenay's Neck*. This indenture, made the thirty-first day of January, in the year of our Lord one thousand seven hundred and fifty-nine, between *Thomas Sligh*, of the one part, and *Thomas Hammond*, of, &c., of the other part, witnesseth, that the said *Thomas Sligh*, for, &c., hath given, &c., unto him the said *Thomas Hammond*, his heirs and assigns forever, all that part of a tract or parcel of land called *Mountenay's Neck*, lying, &c., beginning for the part hereby bargained and sold, at a bounded post set up for the beginning boundary of the whole tract called *Mountenay's Neck*, standing near the eastern shore side of the north-west branch of *Patapsco* river, and running thence north-north-east fifty-four perches and fourth part

of a perch, north forty-seven degrees west, forty-five perches and three-fourths part of a perch, unto *Peter Lettick's* part of said land ; then bounding on said *Lettick's* part, south twenty-one degrees and fifteen minutes, west fifty-seven perches unto the aforesaid north-west branch of the *Patapsco ;* then bounding on the said north-west branch the two following courses, viz : south sixty-eight degrees east, sixteen perches ; south thirty-two degrees east, twenty-two perches and half a perch, until it intersects the first line of the whole tract, and then bounding on that line reverse of the same to the beginning post, containing fourteen acres and one-fourth part of an acre, more or less.

And the plaintiffs further proved that the said *Thomas Hammond* died before the Revolution, leaving *William Hammond* his eldest son and heir at law, and that he inherited all the real estate of his father *Thomas.*

And further offered in evidence two deeds from said *William Hammond* to *John Cornthwaite,* of the 20th December, 1775, and of the 2nd April, 1779 ; two deeds from *John Cornthwaite* to *John Hammond,* of the 24th December, 1779, and of the 7th June, 1780 ; a deed of trust from *John Hammond* to *John Anderson,* of the 4th of March, 1795.

WILLIAM HAMMOND *to* JOHN CORNTHWAITE. *Conveyance.* This indenture, made this twentieth day of December, seventeen hundred and seventy-five, between *William Hammond,* of, &c., shipwright, of the one part, and *John Cornthwaite,* of the same place, merchant, of the other part, witnesseth, that the said *William Hammond,* for, &c., hath granted, &c., unto him the said *John Cornthwaite,* his heirs and assigns forever, all that piece or parcel of land situate, lying and being in the south-east addition to *Baltimore* town, being part of a tract or parcel of land called *Mountenay's Neck,* and is contained within the following metes and bounds, courses and distances, viz : Beginning for the part hereby bargained and sold at the north-west corner of *Caroline* street and *Wilkes* street, and running thence along *Wilkes* street westerly seventy feet ; thence southerly parallel with *Caroline* street to the out-line of the said tract

of land called *Mountenay's Neck;* thence running and bounding therewith to *Caroline* street aforesaid; and thence by a straight line to the beginning; together with all, &c.

WILLIAM HAMMOND *to* JOHN CORNTHWAITE. This indenture, made this second day of April, seventeen hundred and seventy-nine, between *William Hammond,* of, &c., shipwright, of the one part, and *John Cornthwaite,* of the same place, merchant, of the other part. Witnesseth, that the said *William Hammond,* for, &c., hath granted, &c., unto him, the said *John Cornthwaite,* his heirs and assigns forever, all that piece, part or parcel of land, situate, lying and being in the southeast addition to *Baltimore* town, being a part of a tract of land called *Mountenay's Neck,* and is contained within the following metes and bounds, courses and distances, viz: Beginning for the part hereby bargained and sold at the end of seventy feet westerly from the north-west corner of *Caroline* and *Wilkes* street, and running thence along *Wilkes* street, westerly, one hundred feet to *Petticoat* lane; thence running and bounding on *Petticoat* lane, southerly, into the water; thence running and bounding on and with the water, easterly, parallel with *Wilkes* street one hundred feet, to that part of the said land by the aforesaid *William Hammond* heretofore sold to the said *John Cornthwaite;* and then running and bounding therewith by a straight line to the beginning, together with all, &c.

The two deeds from *John Cornthwaite* to *John Hammond,* reconveyed the lots described in the two preceding deeds from *William Hammond* to *John Cornthwaite.*

JOHN HAMMOND *to* JOHN ANDERSON. *Deed.* This was a conveyance in trust, dated 4th March, 1795, reciting, amongst other matters: "And whereas, a marriage is intended shortly to be had and solemnized between the said *John Hammond* and a certain *Elizabeth Anderson,* the sister of the above named *John Anderson,* and the said *John Hammond* being desirous of conveying the above described ground in trust for the use of the said *Elizabeth Anderson,* his intended wife, after his decease, and for the other uses hereinafter mentioned, he the said *John Hammond* hath agreed to execute these presents;" and in

consideration thereof conveyed the legal estate to *John An-derson*, in fee, in trust for the use of *John Hammond*, for life, without impeachment of or for any manner of waste, and also with such power of leasing as is hereinafter contained.   "And from and immediately after the decease of the said *John Ham-mond*, then to the use and behoof of the said *Elizabeth An-derson*, if she shall survive him, and her assigns, for and dur-ing the term of her natural life, without impeachment of or for any manner of waste, *and also with such power of leasing as is hereinafter contained*, and from and immediately after the de-termination of the said several estates, then to the use of the said *John Anderson* and his heirs during the lives of the said *John Hammond* and *Elizabeth Anderson*, and the life of the survivor of them, upon trust to support and preserve the con-tingent uses and estates hereinafter limited from being defeat-ed or destroyed, and for that purpose to make entries or bring actions as occasion shall require; but nevertheless to permit and suffer the said *John Hammond* and his assigns during his life, and after his decease the said *Elizabeth Anderson*, (if she shall survive him, and her assigns during her life,) from time to time to receive and take the rents, issues and profits of the said premises to and for his, her and their own use and benefit respectively, and from and immediately after the decease of the survivor of them, the said *John Hammond* and *Elizabeth An-derson*, to the use and behoof of all and every the children of the said *Elizabeth Anderson*, by the said *John Hammond* law-fully to be begotten, to be equally divided between or among them, if more than one share, and share alike, as tenants in common, and not as joint tenants, and to their heirs and as-signs forever; but if any of the said children shall not have arrived at the age of twenty-one years at the decease of their said parents, then upon his further trust," &c.

And the plaintiff also proved that *John Hammond* intermar-ried with the plaintiff in this case soon after the execution of the said last mentioned deed; that she was the sister of said *John Anderson;* that *John Anderson* died about the year 1805, and *John Hammond* soon after him.

The plaintiff further offered in evidence the permission to *John Hammond,* of the *Baltimore Port Wardens,* to extend his ground to the south side of *Aliceana* street, dated 11th September, 1784; also the patent of *Todd's Range,* 1st June, 1700, viz:

"At a meeting of the *Baltimore* Port Wardens, *Baltimore,* September 11th, 1784, present, Samuel Purviance, president, John Sterett, Samuel Smith, Thomas Elliot, Richard Ridgely, Thos. Russell, Daniel Bowly, William Patterson, Robert Henderson. The board took into consideration the applicatoin of *John Hammond,* and thereupon ordered, that *John Hammond* shall be permitted to extend his wharf in a south direction, parallel with *Caroline* street, to the south side of *Aliceana* street extended, he, the said *John Hammond,* engaging to leave the width of *Aliceana* street open forever hereafter as a public highway."

And the patent to *James Todd,* for *Todd's Range,* dated 1st June, 1700, for all that tract or parcel of land heretofore called by the name of *Cole's Harbour,* but now called *Todd's Range,* " beginning at a bounded white oak, standing in the line of a parcel of land formerly belonging to *Alexander Mountenay,* and now in the possession of the aforesaid *Todd,* and running west to a bounded red oak standing by a small branch called the *Spring Branch,* then *more* west seventy-five perches, to a *double* white oak, in all containing three hundred and twenty perches; then north-northeast, two hundred seventy-five perches to a red oak, being a bound tree of the aforesaid *Mountenay's* land, and then south-southwest with the said *Mountenay's* line to the first bounded tree, containing and now laid out for five hundred and ten acres, more or less, according to the certificate of survey thereof, taken and returned into our land office, bearing date the seventeenth day of February, one thousand six hundred and ninety-eight, and there remaining, together with all the rights, profits, benefits and privileges thereunto belonging, (*Royal Mines* excepted.) To have and to hold, &c.

The plaintiff also offered a record of a judgment and recovery in ejectment in the Provincial Court, of *Yoakley and Company's* agent, lessee, vs. *John Hurst*, April session, 1705, for "the three hundred acres of land aforesaid, lying in the county aforesaid, *and late in the tenure or occupation of James Todd*, of the aforesaid county, planter, beginning at a bounded white oak on a point, being the first bounded tree of *Cole Harbour*, by the northwest branch, and running down the river or branch, east-southeast, for breadth one hundred and forty perches, to a locust post on a little point, and then with a line drawn north-north-east, with the line of *Mountenay's* land, for length of two hundred twenty-four perches to a bounded white oak, standing in the said line, then with a line drawn west-northwest one hundred and forty perches to a red oak, standing in the north-northeast line of the said land of *Mountenay's*, then running with the said land south-southwest fifty-six perches to a white oak, then with a line drawn northwest two degrees south, for the length of two hundred four perches to a gum tree, standing near the said branch, then with a line drawn south-southwest seventy-five perches to a white oak, standing in the corner of the old field by the falls or branch aforesaid, then with a line drawn southeast and by south to the said branch, and with said branch southeast and by south to the first bounded tree."

And also offered in evidence a certified extract from the debt books, viz :

I hereby certify that in the debt book for *Baltimore* county, for the year 1754, in page 21, there is the following entry, viz :

Rent.

*Thos. Sligh*, Dr. part of *Mountenay's Neck*, 100 acres, £0  4  0

Also in the debt book for said county, for the year 1755, in page 22, is the following entry, viz :

*Thos. Sligh*, Dr. part of *Mountenay's Neck*, 200 acres, £0  8  0

Also in the debt book for said county, for the year 1756, in page 24, is the following entry, viz :

*Thos. Sligh*, Dr. part of *Mountenay's Neck*, 200 acres, £0  8  0

Also in the debt book for said county, for the year 1757, in page 19, is the following entry :

*Thos. Sligh,* Dr. part of *Mountenay's Neck,* 200 acres, £0 8 0

Also in the debt book for said county, for the year 1758, in page 23, is the following entry :

*Thos. Sligh,* Dr. part of *Mountenay's Neck,* 200 acres, £0 8 0

Also in the debt book for said county, for the year 1759, in page 20, is the following entry :

*Thos. Sligh,* Dr. part of *Mountenay's Neck,* 184 acres, £0 7 4
Part of *Mountenay's Neck* and *Todd's*
*Range,* 150 acres, - - - 0 6 0

Also in the debt book for said county, for the year 1760, in page 20, is the following entry :

*Thos. Sligh,* Dr. part of *Mountenay's Neck,* 200 acres, £0 8 0

Also in the debt book for said county, for the year 1761, in page 19, is the following entry :

*Thos. Sligh,* Dr. part of *Mountenay's Neck,* 200 acres, £0 8 0

Also in the debt book for said county, for the year 1762, in page 19, is the following entry :

*Thos. Sligh,* Dr. part of *Mountenay's Neck,* 184 acres, £0 7 4
Part of *Mountenay's Neck* and *Todd's*
*Range,* 150 acres, - - - 0 6 0

Also in the debt book for said county, for the years 1763, 1764, 1765, 1766, 1768, and 1769, in page 19, are the following entries, viz :

*Thos. Sligh,* Dr. part of *Mountenay's Neck,* 184 acres, £0 7 4
Part of *Mountenay's Neck* and *Todd's*
*Range,* 148 acres, - - - 0 5 11

The plaintiff further proved that some time after the death of the said *John Hammond,* the plaintiff in this case intermarried with a certain *Robert Casey,* who departed this life some time before the impretation of the writ in this case.

The plaintiff further offered in evidence the lease from *John Hammond* to *Thomas McDowal,* dated the 8th February, 1798, for the lot marked No. 10 on the plat.

The plaintiff also offered in evidence the ordinance of the Mayor and City Council, of the 11th March, 1823.

The plaintiff further, by *Ephraim Smith* and others, offered in evidence the plots and explanations in this case, and proved that the location of the above deeds, patents, record and permission were correctly made thereon ; and proved that *John Hammond*, during his lifetime, filled up and improved a part of his lot on the east side of *Caroline* street, fronting on the water, and in this way, and by a wash that came down *Caroline* street, a bar was made above ordinary high-water mark, which extended in part to the property leased to *McDowal ;* that after this lease *McDowal* continued to fill up his lot until about the year 1800, when he erected a house and enclosed it with a board fence ; that the ground at the time when it was thus enclosed was raised above ordinary high tide, and that it has remained in that condition until the present time; that *John Hammond*, during his lifetime, and the plaintiff, since his death, have collected the rent of the property leased to *Mc-Dowal ;* that the northern blue shaded line, beginning at A, shows correctly where the water ran at ordinary high tides in 1783. And the more southern blue shaded line, beginning at C, show the water line in 1801 ; that the water continued to flow nearly in the same way until the year 1824, with the exception of the improvement and filling up made by *Hammond* and *McDowal*, as above mentioned. That there was a great wash that came down *Caroline* street, crossing the square of the plaintiff from the southeast intersection of *Fleet* and *Caroline* streets, and flowing in a southwesterly direction towards *Spring* street, where it insersects *Aliceana* street; that the deposits of this wash was very considerable, and the effect of it was to render the water on the upper part of the square of ground above *Aliceana* street much shallower than it was before, so that there was on each side of the wash a mud flat, that was left nearly bare at low tides, but the water was shallower above than it was at *Aliceana* street; that the wash down *Caroline* street was diverted in an easterly direction from the cove in 1808, when the deposite was stopped ; that along the north side of *Lancaster* street there was filling up by the city before any was done north of it, and that along that line

there were considerable deposites of earth made at places, the water running in the intervals between them; that this was four or five years before the city began to fill up above; that along *Harford* run there was a good deal of deposites by alluvion at that period, so that *Harford* run could not be passed through except by tunnels; that *John Hammond* was in possession of the property from *Wilkes* to *Fleet* streets, and filled it up east and west of *Caroline* street, and collected the rents from *McDowal's* house, and *Mrs. Casey* since his death; that *McDowal* built a house about the year 1800, a year or two after he got his lease, on the ground marked on the plat leased by him from *Hammond*; and further, on cross examination, proved that *William Inloes'* fence could not be seen from *Wilkes* street; that the logs of the fence did not join *Inloes'* ground, but commenced rather eastwardly of *Caroline* street, and by said *Smith*; that the old people used to laugh at *Inloes* for putting it up; that one *Spencer* had a fence extended from a point west of *Spring* street towards *Canal* street; that *Spencer's* fence and *Inloes'* did not join, and that *Inloes'* fence did not go as far as *Spring* street.

And the plaintiff further offered evidence by *James W. Collins,* that he was City Commissioner and Port Warden in the year 1823; that in that year the whole north line of *Lancaster* street from *Canal* street east to west side of *Caroline* street, had been for some time logged; that along the line there are deposites of earth thrown there by the mud machines, and that the mud running over had gone toward filling up the ground immediately north of the north line of *Lancaster* street, and to fill up at the east side of *Caroline* street very little ground showed, except at the corner of *Canal* street; that there was an opening at *Caroline* and *Lancaster* streets, through which scows went; that from *Lancaster* street northerly, above *Aliceana* street, (with the exception of the ground projecting as marked on the plat as *Inloes'* ground, near the corner of *Aliceana* street and *Strawberry* alley,) the water ran in 1823 along the eastern side of *Strawberry* alley, and was deep there, and that the water covered the ground (except where there were

the deposites aforesaid, which did not extend to *Aliceana* st.}
northerly from *Lancaster* street beyond *Aliceana* and westerly
of *Strawberry* alley; that he left the work of filling up in 1829;
that the ground had been thrown over the north side of *Lan-
caster* street, but had not in 1829 filled up as far as *Aliceana*
street; that he saw nothing of *William Inloes'* fence in 1823.

And the plaintiff further proved by *William Davy*, that he
married in the family of *Thomas Hammond,* having married
the daughter of *William Hammond*, who was the eldest son of
*Thomas;* that *Thomas* died before the revolution, and that
*William*, as the eldest son, inherited his estate under the *En-
glish* law; that *Thomas Hammond* had two sons, was a sea
captain, and died in *Boston;* that he lives at the corner of
*Bond* and *Wilkes* street, and has lived there many years, and
knows how the water ran in 1819; that *Caroline* street was
lower than *Strawberry* alley, and the water would run through
it high up; that the filling up along *Aliceana* street and *Caro-
line* street, was completed four or five years ago in a proper
state for passing from *Fleet* street down to *Aliceana* street.
Six or seven years ago the ground from *Lancaster* to *Aliceana*
street was not yet filled up; that the fence of *William Inloes*
was put up between 1808 and 1812; that the water at high
tide ran over it, and the tide was enough to break it down with
ice, and that it broke away at times and was kept up by repairs
seven or eight years; and that he does not know that it re-
mained until the city filled up; that it was before the war that
he saw it last renewed ; that it was a trifling affair to stop the
mud ; that boats could, in a smart tide, go over it ; that it ex-
tended westerly about two or three hundred feet, but not west
of *Spring* street ; that it was made of stakes driven down into
the mud seven or eight inches wide and about an inch thick ;
that the stakes did not go up to the land, and that between
them and the land there were logs which went about half a
square, and about sixty feet out ; that there was no wash where
the logs were ; that the wash ran down *Caroline* street to *In-
loes'* said fence, and was by it turned westerly of the fence ;
that he saw *Inloes* repairing his fence two or three times ; that

*Inloes* said he wanted to go to *Eden* street to fill up his lot; that witness built houses for *Inloes* on *Aliceana* street, west of *Strawberry* alley; that he knew *Joshua Inloes'* wharf; that the water was deep at its north and south sides, and that vessels could come up to it, carrying seven or eight feet depth of water; that *William Hammond* died in 1783 or 1784; that before he died he had sold nearly all his property; that he left a son *Thomas* and three daughters, and that this *Thomas* died, while a boy, in the year 1797.

The plaintiff further offered proof by *Joseph Owens*, that in the year 1819 he was appointed City Commissioner and Port Warden, and so continued until 1825; that in 1823 the water flowed to the eastern side of *Strawberry* alley, above *Aliceana* street and from *Lancaster* street, and was deep there; that he acted as City Commissioner under the ordinance of 1823 for filling up the cove, and under the ordinance contracted with parties for filling up to the extent as required according to the ordinance by the Commissioner of Health, the limits for the filling up were (as shown by witness on a plat, now exhibited, made by the city,) along the eastern side of *Strawberry* alley, extending northerly, but not as far westerly as between *Caroline* and *Spring* streets. Cross examined, he says, that the owners of ground south of *William Inloes'* lot entered into contracts under the ordinance for filling up; that he does not remember that any improvements or filling up was, under the ordinance of 1823, directed by the Board of Health to be made in front of the grounds on *Wilkes* street; that he does not remember calling on *Mrs. Casey* as an owner of ground on *Wilkes* street, nor on what owners there he called; that the depositing of mud could have been seen from *Wilkes* street; that no notice was given by any one owning lots on *Wilkes* street, not to go on with the filling up.

The defendants, to prove the issue on their part, offered in evidence the following patents, deeds and other papers, to wit:

The escheat patent of *Mountenay's Neck*, dated 7th July, 1737.

The patent of *Island Point* to said *Fell*, dated 15th June, 1734.

The will of *William Fell*, (the elder,) dated 12th January, 1746.

Deed of *Edward Fell* to *Thomas Sligh*, dated 19th August, 1758; also, deed from *Samuel Wheeler and wife* to *David Jones*, 22nd March, 1685.

The patent of *Bold Venture*, dated 20th March, 1695.

The escheat certificate of *Mountenay's Neck*, dated 14th April, 1737.

The patent of *Long Island Point*, dated 10th July, 1671.

The certificate of *Fell's Prospect* to *Edward Fell*, dated 20th May, 1761.

The following is a copy of the patent of *Mountenay's Neck* in the case of *Rogers, et al, lessee vs. Moore:*

WILLIAM FELL'S PATENT—-200 ACRES MOUNTENAY'S NECK. *Charles, &c.* Know ye, that whereas *William Fell*, of *Baltimore* county, by his petition to our agents for management of land affairs within this province, did heretofore set forth that there was escheat unto us a certain tract or parcel of land, called *Mountenay's Neck*, lying and being in the county aforesaid, originally, on the 30th day of June, 1663, granted unto a certain *Alexander Mountenay*, for two hundred acres under old rent; that afterwards, on the 22nd of March 1685, a certain *Samuel Wheeler* and *Ann*, his wife, by their indenture of bargain and sale, conveyed the said land to a certain *David Jones*, who died thereof possessed, intestate, and without heirs, by which means, or for want of heirs of the said *Alexander Mountenay*, or regular conveyances from the first taker up, the same is become escheat unto us as aforesaid, and the petitioner being the first discoverer thereof, humbly prayed to be admitted to its purchase, be the same escheat by the means aforesaid, or by any other ways or means whatsoever, and, &c.

We do therefore, in consideration thereof, and other the premises, hereby give, grant and confirm unto him the said *William Fell*, all that the aforesaid tract or parcel of escheat land, now resurveyed, and called *Mountenay's Neck*, lying and being in the county aforesaid: Beginning at a bounded white oak standing on the north side of the north-west branch

of *Patapsco* river, and near the mouth of a small branch descending into the north-west branch, which tree was bounded by commissioners appointed to examine evidences concerning the bounds of the same tract of land, at the place where the original beginning tree did stand, and running thence up the said north-west branch and over the mouth of a cove west-north-west one hundred perches to a bounded red oak, at or near the place whereat the second bounded tree did stand, thence north-north-east three hundred and twenty perches, east-south-east one hundred perches, and thence south-south-west (as expressed in the grant,) unto the beginning, containing and laid out for two hundred acres, more or less, according to the certificate of resurvey thereof, taken and returned into our land office, bearing date the 27th day of April, 1737, and there remaining, together with, &c.

WILLIAM FELL—PATENT—85 ACRES—ISLAND POINT. *Charles, &c.* Know ye, that whereas *Carroll,* of the city of *Annapolis,* in *Anne Arundel* county, *Chirurgeon,* by his humble petition to our agent for management of land affairs within the province, did heretofore set forth that a certain *William Poultney,* of *Baltimore* county, died, was possessed of a tract of land called *Island Point,* situate on a branch of *Patapsco* river, granted unto the said *Poultney* for one hundred acres, by patent bearing date the 10th day of July, Anno Domini 1671, and died thereof possessed Anno Domini 1674, and although an alien, made a will and devised the same to *Edward Monfrett,* likewise an alien, in the words: "*Item.* I give and bequeath unto *Edward Monfrett,* of *Patapsco,* all my lands, goods and chattels;" whereby the said *Monfrett,* as the petitioner conceived, had but an estate for life, although, that he the said *Poultney* was capable of devising the said land, and that after the decease of the said *Monfrett,* the said land would come to the heirs of the said *Poultney;* but so it was, that no heirs of the said *Poultney* or *Monfrett* had since appeared to claim the said land, by means whereof, or some other the causes before set forth, the petitioner conceived the same become escheat unto us as aforesaid, and inasmuch as the petitioner had been

the first discoverer, prayed to be admitted to its purchase, and &c.   In pursuance whereof, it is certified into our land office, that the said tract is resurveyed, by which it appears that the whole now contains the quantity of eighty-five acres, whereof fourteen acres is vacant land added, for which said escheat and vacancy the said *Charles Carroll* has, according to our instructions to *Edmund Jenings, esq.,* our present judge of our land office, bearing date at *Annapolis* the 14th of June 1733, paid and satisfied unto *Daniel Dulany, esquire,* our present agent and receiver general, for our use, as well the sum of seven pounds sterling, being one-third part of the value set on the said escheat, as also the sum of six shillings sterling, for the rights to the vacancy added ; but before our grant thereon to him did issue, he the said *Charles Carroll* did, on the 4th of June 1734, for a valuable consideration, assign, sell, transfer and make over unto *William Fell,* of *Baltimore,* his heirs and assigns forever, all his right, title and interest, of, in and to the said land and the certificate thereof, who has supplicated us that our letters patent of confirmation may now issue unto him, which we have thought fit to condescend unto.   And we do, in consideration thereof and other the premises, hereby give, grant and confirm unto him the said *William Fell,* all that the aforesaid tract or parcel of escheat land, with its vacancy added, now resurveyed, and still called *Island Point,* lying and being in *Baltimore* county : Beginning, &c.

The last will of *William Fell,* dated 12th January 1746, devised as follows :

In some good degree of the fear of Almighty God, it seemeth good to me, *William Fell,* of *Baltimore* county in the province of *Maryland,* to make and declare this to be my last will and testament, relating to those things it hath pleased God to bless me with in this world, in manner and form, following : *First.* My will and desire is that all those debts, &c.

*Item.* I give and bequeath unto my son *Edward Fell,* three tracts of land, called *Long Island Point, Cole Harbour* and *Trynkeltfield ;* also, all the south part of a tract of land called *Mountenay's Neck,* as shall be found lying on the south side

of the main road now lying through the said tract, &c.; also, I give and bequeath unto my daughter *Catharine* the remaining north part of my tract of land already mentioned by name of *Mountenay's Neck,* lying on the north side of the main road aforesaid, and, &c.

EDWARD FELL *to* THOMAS SLIGH, 200 *Acres Mountenay's Neck.* By indenture dated 17th August 1758, conveyed all his, the said *Edward Fell,* his right, title, interest, property, claim and demand, as well in equity as in law, of, in and to all that tract or parcel of land and premises, lying and being in the county aforesaid, on the north-west branch of *Patapsco,* called *Montany's Neck,* containing two hundred acres, more or less. To have and to hold the said bargained tract or parcel of land and premises, with the appurtenances, and every part and parcel thereof, unto him the said *Thomas Sligh,* his heirs and assigns forever, and to his and their only proper use and behoof.

SAMUEL WHEELER AND WIFE *to* DAVID JONES. *Know all men by these presents,* that I, *Samuel Wheeler,* and *Ann Wheeler,* my wife, for divers good causes and considerations hereunto moving, have made, constituted and appointed, and do, by these presents, ordain, constitute and appoint my well-beloved friend, *Thomas Lightfoot,* for me and in my stead, to transfer, convey and make over unto *David Jones,* of *Baltimore* county, all that parcel of land called *Mountenay's Neck,* being two hundred acres of land, lying upon the north-west branch of *Patapsco* river, and we, the said *Samuel* and *Ann,* do hereby ratify and confirm and allow what our said attorney shall act or do in the premises, to be of as much strength and power in law as we ourselves were then and there present. Witness our hands and seals this            1686.

SAMUEL WHEELER, (Seal.)

ANN WHEELER,    (Seal.)

Signed, sealed and delivered in the presence of us, *Edward Batson, William Baroll.*

*June 1st,* 1686. In open court in *Baltimore* county, *Mr. Thomas Lightfoot* came and acknowledged himself to be the

attorney of *Samuel Wheeler* and his wife, for the making over a parcel of land unto the within mentioned *David Jones*, called *Mountenay's Neck.*

*Memorandum.* That the blank in the above power of attorney was left in the original record.

   Certified—per, Roger Matthews, *Transcriber.*

Transcribed from liber C, No. 1, folio 189.

This indenture, made the twenty-second of March, in the year of our Lord God everlasting, one thousand six hundred and eighty-five, between *Samuel Wheeler* and *Ann Wheeler*, of *Cecil* county, his wife, in the province of *Maryland*, gentleman, of the one part, and *David Jones*, of *Baltimore* county, of the aforesaid province, gentleman, of the other part, witnesseth, that the said *Samuel Wheeler* and *Ann Wheeler*, his wife, for a valuable consideration already in hand received, have bargained, sold and made over, and do, by these presents, absolutely bargain, &c., from me, my heirs and assigns, unto the aforesaid *David Jones*, his heirs and assigns, all that tract or parcel of land called *Mountenay's Neck*, lying in *Baltimore* county and upon the north side of *Patapsco* river, and upon the north side of the north-west branch of the said river: Beginning at a marked red oak by a little branch, and running up to the north-west branch west-north-west one hundred perches, over a cove into a marked white oak standing on a point, then running north-north-east into the woods three hundred and twenty perches, then running east-south-east one hundred perches, then running south-south-west to the first tree, for two hundred acres of land, more or less. Together with all the estate, right, title, interest, claim and demand whatsoever, of him the said *Samuel Wheeler* or *Ann Wheeler*, his wife, their heirs, executors or administrators. To have and to hold, &c.

This conveyance of land, with the appurtenances thereof, was acknowledged and made over by *Thomas Lightfoot*, the attorney of *Samuel Wheeler* and *Ann Wheeler*, unto *David Jones*, and was then and there acknowledged to be their act

and deed, before us, this 1st day of June, 1686, in open court in *Baltimore* county.            Signed, per order,

THOMAS HEDGE, *Cl'k Balt. Co.*

Transcribed from liber C, No. 1, folio 290, 300, 301 and 302.

JOHN OULTON'S PATENT, 161 *Acres—Bold Venture. Charles, &c.  To all, &c:* Know ye, that for and in consideration that *John Oulton*, of *Baltimore* county, in our said province of *Maryland*, hath due unto him one hundred sixty-one acres of land within our said province, being due unto him by virtue of a warrant for five hundred acres, granted him the 26th November 1695, as appears in our land office, and upon such conditions and terms as are expressed in our conditions of plantations of our said province, bearing date the 5th day of April, 1684, and remaining upon record in our said province of *Maryland*. We do hereby grant unto him the said *John Oulton*, his heirs and assigns, all that tract or parcel of land called *Bold Venture*, lying on the north side of *Patapsco* river, and on the north side of *Whetstone* branch: Beginning at a bounded white oak, standing by the branch side, it being a bound tree of *Pountny's Point*, and running thence north-north-east fifty-eight perches to a bounded red oak of *Mountenay's*, then with *Mountenay's* land west-north-west one hundred perches to a bounded white oak of *Mountenay's*, then with *Mountenay's* long line north-north-east three hundred twenty perches, then west-north-west fifty-four perches, then south-south-west three hundred twenty perches to a bounded ash, then south-south-west two degrees southerly twenty-four perches to the river side, then down the river south-south-east two degrees easterly eleven perches, then south-south-west two degrees southerly twenty-four perches, then with a direct line to the first tree, containing, and now laid out for one hundred sixty-one acres of land, more or less, according to the certificate of survey thereof, taken and returned into our land office, bearing date the 23rd December 1695, and there remaining, together, &c. To have and to hold the same unto the said *John Oulton*, his heirs and assigns forever, &c.

*April 14th*, 1737.  Whereas *William Fell*, of *Baltimore* county, by his petition to his lordship's agent for management of land affairs within this province, has set forth that there is escheat unto his lordship a certain tract or parcel of land called *Mountenay's Neck*, lying and being in the county aforesaid, originally, on the 30th day of June, 1663, granted unto a certain *Alexander Mountenay*, for the quantity of 200 acres, under old rent; that afterwards, on the 22nd March 1685, a certain *Samuel Wheeler* and *Ann*, his wife, by their indenture of bargain and sale, conveyed the said land to a certain *David Jones*, who died thereof possessed, intestate, and without heirs, by which means, or for want of heirs of the said *Alexander Mountenay*, or regular conveyances from him as first taker up, the same is become escheat to his lordship as aforesaid; and the petitioner being the first discoverer thereof, humbly prayed to be admitted to its purchase, be the same escheat by the means aforesaid, or by any other ways and means whatsover, and a special warrant to resurvey the same, with liberty of adding any vacant land that can be found thereto contiguous, &c.; that upon return of a certificate of such resurvey, he paying his lordship's agent such reasonable price as shall be agreed upon for the purchase of said escheat, and making good rights to the vacancy added, might have his lordship's letters patent of confirmation issue unto him thereon, which is granted him, provided he complies with all requisites, and finally sues out such grant within two years from the date hereof.  Lay out, therefore, and carefully resurvey for and in the name of him the said *William Fell*, the aforesaid tract or parcel of escheat land called *Mountenay's Neck*, according to its ancient metes and bounds, and by your outlines adding any vacant land you can find thereto contiguous, whether cultivated or otherwise, not running your lines, &c.   In testimony, &c.

LAND OFFICE, *Annapolis*, 24th Oct. 1842.

*Dear Sir*,—Yours of the 22nd inst. I have just received. Herewith I hand you a copy of the warrant of escheat obtained by *William Fell* in 1737, upon *Mountenay's Neck*.   There is no petition to be found, either on record or on file, in this office.

The warrant sets forth that *William Fell*, by his petition to his lordship's agent, &c.; but this appears to be the form of all the warrants issued under the proprietary government without any petition being filed. If a petition had been filed, it would of course have been recorded with the warrant, and made a part of the record. Applications for warrants, I presume, were frequently made under the proprietary government in person and not in writing, as is also the case under the State Government. I have never been able to find any petition for a warrant, either on file or of record, in this office, and have therefore concluded that none were ever filed. Under the State Government, when application is made for a warrant of escheat, we insert in the warrant such description of the land as is furnished us by the party applying for the warrant, the want of due precision being at his risk. I can send you nothing more than a copy of the warrant. (In haste.) Yours, very respectfully,

*William F. Giles, Esq.* G. G. Brewer.

William Poultney, *Patent* 100 *Acres—Long Island Point*. *Cæcilius, &c.* Know ye, that we, for and in consideration that *William Poultney*, of the county of *Baltimore*, in our said province of *Maryland*, planter, hath due unto him one hundred acres of land within our said province, by assignment from *Robert Wilson*, the assignee of *Capt. Thomas Beason*, due the said *Beason* for transporting *John Greene* and *Sarah Sandstead* into the said province, to inhabit, as appears upon record. And upon such conditions and terms as are expressed in our conditions of plantation, &c., do hereby grant unto him the said *William Poultney* all that parcel of land called *Long Island Point*, lying in *Baltimore* county, on the north side of *Patapsco* river, and on the north-west branch of the river: Beginning at a bounded locust standing at the head of a round bay, and running down the said bay south-south-west eighty perches to a bounded *Spanish* oak at the mouth of said bay, and from the said oak up the said branch north-west thirty-six perches, then west-south-west one hundred perches, then west-north-west seventy-two perches to the bottom of *Long Island Point*, then north-east sixteen perches, then east and by south sixty

perches, then north and by east eighty perches to a bounded red oak of a parcel of land laid out for *Alexander Mouutenay,* then north-north-east by *Mountenay's* land seventy-six perches, and then to the first bounded tree, containing, and now laid out for one hundred acres of land, more or less, together, &c., in fee, dated 10th July, 1671.

Mr. Edward Fell's certificate—*Fell's Prospect,* 343 *Acres—Patented the 20th May* 1761. *Rent per annum* £13 *9s sterling, charged to the Rent Roll.*

Baltimore County, *Sct :* By virtue of a special warrant, granted out of his lordship's land office, bearing date by renewment, October 23rd, Anno Domini 1760, to lay out and resurvey for *Edward Fell,* of *Baltimore* county, the following tracts or parcels of land, viz : *Long Island Point,* lying and being in *Baltimore* county, originally, on the 23rd of October 1670, granted unto a certain *William Poultney,* for one hundred acres, under new rent; *Copius Harbour,* originally, on the 10th day of August, Anno Domini 1684, granted unto a certain *John Copius,* for one hundred acres, under new rent; *Carter's Delight,* originally, on the 10th day of December, Anno Domini 1717, granted *John Carter,* for one hundred acres, under new rent; and *Trinket Field,* originally, on the 18th day of August, Anno Domini 1736, granted unto *William Fell,* father of the aforesaid *Edward Fell,* for eighteen acres, under new rent, to be laid out according to their ancient metes and bounds. Nevertheles, correcting and amending any errors in the original surveys, and by my outlines adding any vacant lands I could find thereto contiguous, whether cultivated or otherwise, &c. I, *William Smith,* deputy surveyor of *Baltimore* county, have carefully resurveyed for and in the name of him the aforesaid *Edward Fell,* the aforesaid tracts or parcels of land, according to their ancient metes and bounds: Beginning, for *Long Island Point,* at a bounded white oak standing at the head of a round bay on the north-west branch of *Patapsco* river, and at or near the spot where stood a bounded locust, the original bounded tree, and running thence down the said bay, south-south-west eighty perches, thence north-west thirty-six perch-

es, west-south-west one hundred perches, west-north-west seventy-two perches, north-east sixteen perches, east by south sixty perches, north by east eighty perches, to a bounded red oak, of a tract of land called *Mountenay's Neck ;* then north-north-east by *Mountenay's* seventy-six perches, then with a straight line to the beginning, containing, and laid out for one hundred acres, more or less ; and for the resurvey made by *William Fell* on the aforesaid tract or parcel of land, bearing date the 5th day of June, 1734, as by patent : Beginning at the aforesaid bounded white oak standing at the head of a round bay on the north-west branch of *Patapsco* river, and running thence south four degrees west sixty-six perches, south sixty-three degrees west fourteen perches, north forty degrees west thirty perches, north eighty-seven degrees west forty-two perches, south fifty degrees west fifty-six perches, south seventy-three degrees west twenty-four perches, north fifty-five degrees west fifty-four perches, north forty-five degrees east sixteen perches, south eighty degrees east sixty-four perches, north three degrees east eighty perches, north-north-east seventy-six perches, thence with a straight line to the beginning, containing, and now laid out for eighty-five acres. *Copius Harbour :* Beginning at a bounded red oak, being a bounded tree of *Kemp's Addition,* and running from thence north-west thirteen perches to a bounded water oak standing near the said branch, then running west and by south thirty-two perches to a bounded locust of *Long Island Point,* then running north fifty degrees forty-five minutes west one hundred and thirty perches to a bounded red oak, thence north-east one hundred and fifty-six perches, then south-east by south ninety-six perches, bounding on *Kemp's Addition,* thence with a straight line to the beginning, containing, and laid out for one hundred acres. *Carter's Delight :* Beginning at a bounded red oak standing in or near the given line of *Mountenay's Neck,* and running thence north sixty perches, north seventy-eight degrees east one hundred and thirty perches, south eighty-seven degrees east fifty perches, south fifty-nine degrees east sixty-eight perches, south forty·two perches, north sixty-

four degrees west eighty-six perches, south eighteen degrees west twenty-four perches, south thirty degrees west twenty-two perches, south thirty-six degrees thirty minutes west twenty-six perches, thence with a straight line to the beginning, containing, and laid out for one hundred acres, more or less. *Trinkett's Fields :* Beginning at a red oak bounded with twenty-four notches, a bounded tree of *Copius Harbour,* and running thence north-north-east one hundred and twenty-three perches, south-east by south forty-seven perches, thence with a straight line to the beginning, containing, and laid out for eighteen acres, more or less, which said tracts or parcels of land contains in the whole three hundred and three acres ; thirty-three acres, part thereof, is taken away by elder surveys and lost in navigable water, which I have excluded.   I have also added to the residue of the said tracts seventy acres of vacant land, and three acres of escheat, as part of *Long Island Point,* not heretofore escheated, and liberty now given to escheat the same, and have reduced the whole into one entire tract, bounded as follows, viz : lying in *Baltimore* county : Beginning at a bounded white oak standing at the head of a round bay on the north side of the north-west branch of *Patapsco* river, being the same bounded white oak expressed in the former grant to be the beginning of *Long Island Point,* and running thence bounding on the said round bay the six following courses, viz :  south twelve degrees west ten perches, south twenty-three degrees east six perches, south eleven degrees west twenty-six perches, south ten degrees east twelve and a half perches, south fifteen degrees west fourteen and a half perches, south fifty-three degrees west six and a half perches, to the bottom of the round bay ; then running and bounding on and up the said river the nine following courses, viz :  north seventy-six degrees west seven perches, north thirty-six degrees west twenty-two perches, north sixty-five degrees west sixteen perches, west twenty-six perches, south fifty-eight degrees west thirty-eight perches, south forty-six degrees west thirty perches, south eighty-eight degrees west twenty-six perches, north sixty-one degrees west thirty-four perches, north

thirty-six degrees west nine perches, to the bottom of *Long Island Point*, as expressed in the original grant; then running and bounding with the river the ten following courses, viz : north thirty-eight degrees east eight perches, north fifty-eight degrees east seven perches, south sixty-eight degrees east twenty perches, south eighty-six degrees east twenty-eight perches, south seventy-seven degrees east ten perches, north twenty-five degrees east eighteen perches, north eight degrees east ten and a half perches, north nineteen degrees west fourteen and a half perches, north eight degrees east twenty-eight perches, north thirty-three degrees west sixteen and a half perches to the first line of *Mountenay's Neck*, and running with the said line reversely south sixty-seven degrees and thirty-minutes east eight perches to a post, the beginning of *Mountenay's Neck*, then running and bounding reversely with his given line, north seventeen degrees east two hundred and thirty-eight perches to the beginning tree of *Carter's Delight*, still running and bounding on *Mountenay's Neck*, north seventeen degrees east sixty-seven perches, until it intersects the second line of *Carter's Delight*, then running and bounding with the said line north seventy-eight degrees east one hundred and eleven perches to the end of the said line, still bounding on the said land south eighty-seven degrees east fifty perches, south fifty-nine degrees east sixty-eight perches, south forty-two perches, north sixty-four degrees west eighty-six perches, south eighteen degrees west twenty-seven perches, until it intersects the sixth line of *Kemp's Addition*, then bounding with the said land reversely west-north-west thirty-six perches to the end of the fifth line of the said land; then running and bounding with the land aforesaid, the five following courses, viz : south by west twenty-four perches, south-west by south eighty perches, south-east by south eighty perches, south by west one hundred and twenty perches, south-east thirty-two perches to the beginning tree of *Kemp's Addition* and the second tree of *Parker's Haven*; then bounding on *Parker's Haven* reversely the two following courses, viz : east-south-east seventy perches, north by east two hundred and sixty-five

perches until it intersects the seventh line of *Kemp's Addition*, then running south thirty-seven degrees east thirty perches to a creek called *Harris'* creek; then running down and bounding on the said creek the fifteen following courses, viz: south eleven degrees west fifty-one perches, south fifty-five degrees west sixteen perches, south twelve degrees west sixty-one perches, south fifty-four degrees east six perches, south nineteen degrees west four perches, south sixty-nine degrees west six perches, south ten perches, south thirty-six degrees east fourteen perches, south thirty-two degrees west eighteen perches, south sixty-three degrees west four perches, south fifteen degrees west sixteen perches, south four degrees west thirty-eight perches, south twenty-two degrees west twelve perches, south thirty-six degrees west fourteen perches, south sixty-four degrees west nine perches, to the mouth of the said creek; then running and bounding with the river the five following courses, viz: north eighty-two degrees west forty-six perches, north sixty degrees west sixteen perches, north thirty-three degrees west seventeen perches, north fifty degrees west twenty-four perches, north twenty-three degrees west sixteen perches, then with a straight line to the beginning, containing, and laid out for three hundred and forty-three acres of land, more or less, to be held of the manor of *Baltimore*, by the name of *Fell's Prospect.* Resurveyed March the 10th, 1761.

Wm. Smith, <span style="font-variant:small-caps">D. S., B. County.</span>

*May* 12*th,* 1761. The certificate and plot disagree in the direction of the fifty-fifth course, disallowed.

U. Scott, *Exam'r.*

*May,* 20*th,* 1761. Examined and passed.

U. Scott, *Exam'r.*

On the back of which certificate was the following receipt, viz:

I have received the sum of three pounds thirteen shillings for the within vacancy, and eleven shillings and six pence for the three acres escheat. Patent may therefore issue with his Excellency's approbation,     Edw'd Lloyd.

20*th May,* 1761. Approved,     H. Sharpe.

The defendants then offered in evidence leases for terms of years from *Ann Fell* to *Abraham Inloes*, dated 17th Feb. 1768; from same to *Geo. Fletcher*, dated 3rd Nov. 1768; to same 15th April 1768; to *William Scarff*, dated 27th May 1768; to *William Rowles*, dated 16th September 1769, for the lots 5, 6, 7, 8, 9, on *Bond* street.

And also gave in evidence that each of said papers was truly located by them on the plats in this case; and also proved that said *Inloes*, and the other defendants, and those under whom they claimed, have been in possession of said lots on *Bond* street, claiming title to the same, upwards of thirty years before the institution of this suit. And then proved that *William Inloes* became entitled, as heir of *Abraham Inloes*, to the ground marked on the plat by the No. 5.

And the defendants then further offered in evidence the following ordinances of the Mayor and City Council of Baltimore, to wit: Of 4th May, 1801; 24th March, 1813; 25th March, 1814; 28th May, 1814; 11th March, 1823; 13th April, 1826.

And the following acts of Assembly, to wit: Of 1783, ch. 24, sec. 9; 1796, ch. 68; 1745, ch. 9.

And then the defendants read in evidence the following receipts of payment of taxes to the city of Baltimore, and for filling up for the ground in dispute in this case—(all which are omitted as not material to this report.)

*City Commissioners' Office, Baltimore, 27th June,* 1838. I hereby certify that the following named persons, viz. William Inloes, J. S. Inloes, Godfrey Meyer, James Hooper, A. B. Harrison, George Chapman, and J. L. Chapman, have paid the amount charged them respectively for filling up a square of ground situated between *Caroline* and *Canal* streets, and *Aliceana* and *Lancaster* streets.

By order, R. B. Varden, *Cl'k, C. C.*

The defendants then further to prove the issue on their part, offered evidence, by — *Graves*, that he has resided forty-seven or forty-eight years on *Fell's Point*, and has that long known the property now in dispute; that *William Inloes'* fence was

put down in 1807 or 1808, and continued, he thinks, nine or ten years; that it began at about the middle of *Caroline* street, and went westerly, he would not say as far as *Spring* street; that a great deal of wash at that time come down *Caroline* street; that the wash went against the fence of *Inloes* afore-said, and was turned by it westerly of the fence; that the wash southerly of *Fleet* street spread, the ground being flat; that the fence was made for filling up, and that was known in the neigh-borhood, and that it had the effect of filling up by catching the sediment as it came down; that persons looking could see the fence from *Wilkes* street; that he cannot say it was stand-ing when the city began filling up; that the fence was of inch board, nailed to the log; that persons owning the ground on *Bond* street claimed water rights, and that therefore *Inloes* ran out; that he knew *Joshua Inloes'* wharf; that *Joshua Inloes* married his sister, and that he was apprentice to *Joshua Inloes;* that the wharf was up in 1795, and extended fifteen or twenty feet westerly of *Strawberry* alley; that *Joshua Inloes* had a fence from his wharf; that *William Inloes'* fence began about the middle of *Caroline* street; that he saw *Inloes* six or seven times repair it in that number of years; that it continued eight or nine years; that he thinks he saw it since 1814, but will not speak positively; that the wash which went down *Caroline* str't, was turned eastwardly into *Ann* street about the year 1808, but that still some wash came down until a few years past; that the fence caught some of the wash; that before the fence was put there, there was no ground at the place, and afterwards there was, both on the north and south side of the fence; that the muddy water would go through the fence; that at low tides the fence was bare; that when the fence was put up it was about three feet above the ground; that when witness last saw it, it was eighteen inches above the ground at low tides; that *Chapman*, in 1826 or 1827, built the warehouse marked on the plat.

And the defendants further offered evidence, by *Peter Foy*, that he was a member of the Board of Health from the year 1818 to the year 1825; that the filling up of the cove was not

completed till last year; that in 1814 or 1815 a part of the filling on *Lancaster* street was completed; that the square in dispute has been enclosed six or seven years; that *Chapman's* glass house was built in 1826 or 1827; that eighteen months or two years afterwards the water was expelled from the square by the discharge from the mud machines, and then water was let in and run over the sediment so as to spread it, which was done by the city authorities; that witness went with the city commissioners, under the ordinance of 1823, to owners of ground on *Bond* street, for making contracts under the ordinances, but that he does not remember to whom he went, and all asked signed but *Inloes*, but he said it was not a nuisance, for his lot did not want it; that *Joshua Inloes'* wharf stood about 1794, 1795, or 1796; that it ran out fifty or sixty feet westerly of *Strawberry* alley; that he saw *William Inloes* put a fence, or some contrivance, about 1808 or 1809, in the rear of his (*Inloes'*) lot, to catch the sediment, or that the fence was made by driving down stakes of one or one and a quarter inch stuff into logs or scantling, or something; that the stakes were there a number of years; saw some of them in 1823; that the tops of them contributed to impede the course of the sediment north and south of *Aliceana* street; the ground was bare at low tides; common tides covered it, and ten or twelve years ago the water flowed over the ground above *Aliceana* street; the ground is considerably lower than the beds of the streets; *Inloes* has been claiming title to the ground as it made, and claimed as owner of the lot under his father, and to be entitled to follow the water; the wash down *Caroline* street was over flat ground after leaving *Fleet* street, and then spread; that he does not know whether the fence was kept up in 1813 or 1814; that he passed often where he might have seen it if he had looked; that any person could have seen it from *Wilkes* street; does not recollect taking notice of it.

The defendants further offered evidence, by *Walter Frazier*, that he began to work on the mud machine in 1818, and continued till 1841; that in 1818 the mud was depositing on *Lancaster* street, and that up *Harford* street, for a distance,

there was firm land; that at that time the tide went up back of *William Inloes'* ground, and that a gap for boats was left in *Spring* street, at *Lancaster* street; that he saw *Inloes'* fence in 1818 and in 1825 or 1826, the last year of the filling up, and that in 1825 there was firm land along it on *Inloes'* lot. It was made of stakes driven down, and could have been seen from *Wilkes* street by any person looking at it; has seen *Inloes* repairing the fence somewhere about *Caroline* street; that *William Inloes* always claimed to go to *Harford* run, and said his father's deed would carry him to *Jones' Falls;* that *Inloes* fence stopped the wash.   There was a fence as far as *Eden* street; witness saw it when he was filling up *Eden* street; that in 1819 there was firm land at the corner of *Canal* and *Lancaster* streets; that witness used to cut grass there; that the squares above *Aliceana* street, between *Eden* and *Caroline* streets, were covered with water after the lower squares were filled up.   Cross examined, he says, that the square in dispute was enclosed eight or ten years ago, and that the fence was put around it after the filling up was finished; that *Inloes'* fence began on the east side of *Caroline* street, and ran west of it; that the first time he saw it was in 1817 or 1818; that it was made of stakes driven down and boards nailed to it; that in 1819 there was no attention paid to it, as the ground was filling up; that the stakes, when he first saw the fence, were broken off, and were then some two or three feet apart; that in 1818 the stakes were three feet above the mud, and that when the lot was filled up it was filled three or four feet above the tops of the stakes.

And the defendants further offered evidence, by *Abraham Parks*, that he remembers that about thirty years ago *Inloes'* fence was first done; that witness was in the business of hauling dirt and gravel, and asked *Inloes'* leave to throw out dirt and stones on his lot; that the lot went out then, which was about twenty years ago, pretty far; does not know whether it was high ground beyond *Caroline* street; that it was dry a good smart place beyond *Caroline* street.   That he speaks of the street (*Aliceana* street) west of *Caroline* street as dry about

one hundred feet out; he got permission of *Inloes* before the war to cast dirt and stone along his fence, and did so; he had the filling up of the street, (*Aliceana*,) and hauled a good many loads to it after he got *Inloes'* permission; that the fence was up then; that *Inloes'* fence was repaired from time to time.

The defendants further offered evidence, by *Alexander J. Bouldin,* surveyor of *Baltimore* county, that he executed a special warrant as for vacancy in the year 1836, for a piece of ground, including the ground now in question, issued to *James Tracy* and the heirs of *John Hammond*, and returned the survey to the land office.

And the plaintiff thereupon, further to prove the issue on their part, offered evidence by said *Bouldin*, that the ground now in question was not yet enclosed on the — August, 1839, and that *William Inloes* claimed the ground now claimed by him, on the ground, as he stated, that he had a right to follow the water and to go wherever the water went.

And the plaintiff further offered testimony, by — *Abbott*, that one *Spencer* made a fence, with stakes driven down, beyond *Spring* street, and that was in his opinion the fence mentioned in *Frazier's* testimony, as extending to *Eden* street from *Spring* street.

And the plaintiff further offered to prove by said *Bouldin,* that at all times while the ground was making in the cove, it was the prevalent opinion in that neighborhood that the title to the ground, making by nature or artificially, was in the State or the city, and not in any owners of any of the banks of the cove. But to the admission of this testimony the defendants objected, and the court (ARCHER, C. J.) refused to admit the same to be given. The plaintiff excepted.

2ND EXCEPTION. And the plaintiff and defendants having respectively offered the testimony stated in the aforegoing bill of exceptions, which is made part of this bill. The plaintiff thereupon, further to prove the issue on her part, offered in evidence the following certificate from the debt book of the *Province of Maryland.* (See ante pages 446, 447.)

And the defendants, further to prove the issue on their part, offered to read in evidence the following certificate from the rent-roll of the Province:

**Thomas Sligh from Thomas Sheredine, 26th June, 1756.**

| Acres | Rent | Description | |
|---|---|---|---|
| 200 0 8 0 | | Mountenay's Neck, Escheat. Land originally so called lying on the north side of the N. W. branch of Patapsco river. Resurveyed 27th April, 1737, for William Fell. | |
| 100 0 4 0 | | Thomas Sligh, | Possessors. |
| 100 0 4 0 | | Thomas Sheredine, | |

| Acres | Rent | Holder | Date |
|---|---|---|---|
| 14½ | 0 0 7 | Thomas Hammond from Thos. Sligh, 31st January, | 1759 |
| 10 | 0 0 5 | Peter Lettage from Thos. Sligh, 20th May, | 1757 |
| 200 | 0 8 0 | Thos. Shigh from Bryan Philpott, 9th June, | 1758 |
| | | Thos. Shigh from Edward Fell, 14th August, | 1758 |
| | | Thos. Shigh from Charles Carroll, Esq. 31st May, | 1759 |
| 2 | 0 0 1 | John Brustal from Thos. Sligh, 28th June, | 1759 |
| 4 | 0 0 2 | John Hammond Dorsey from Thos. Sligh, 6th November, | 1759 |
| 4 | 0 0 2 | William Young from Thos. Sligh, 8th November, | 1759 |
| 8¾ | 0 0 4½ | Alexander Stewart from Thos. Sligh, 28th November, | 1759 |
| 2 | 0 0 1 | Daniel Bernet from Thomas Sligh, 28th February, | 1761 |
| 6 | 0 0 3 | Peter Woolrick from Thomas Sligh, 21st May, | 1762 |
| 6 | 0 0 3 | Jacob Myers from Thomas Sligh, May 3rd, | 1766 |
| 9½ | 0 0 5 | John Deaver from Thomas Sligh, July 17th, | 1766 |
| 9 | 0 0 4½ | John Deaver from Thomas Sligh, March 28th, | 1767 |
| 6 | 0 0 | Jacob Myers from Thomas Sligh, 2nd July, | 1768 |
| 1 | 0 0 1 | James Sterret from John Askers, 26th September, | 1771 |
| 1 | 0 0 1 | James Sterret from John Devour, 8th May, | 1773 |
| 1 | 0 0 1 | J. Cornthwaite & G. Hopkins from J. Devour, 21st June, | 1773 |

In testimony that the aforegoing is a true copy from the old rent roll for *Baltimore* county, No. 1, folio 220, one of the records belonging to and remaining [Seal place.] in the Western Shore Land office of *Maryland*, I have hereunto set my hand, and affixed my official seal, this 8th day of November, 1842.

GEO. G. BREWER, *Reg. Land Office, W. S. Md.*

The plaintiff objected to the admission of said last testimony, and the court (ARCHER, C. J.) allowed the said paper to be read in evidence. The plaintiff excepted.

3RD EXCEPTION. And the plaintiff and defendants, having offered the testimony stated in the aforegoing bills of exception, which is made a part of this bill, the plaintiff, further to prove the issue on her part, offered in evidence the patent of *Rogers' Inspection :*

MR. WILLIAM ROGERS—*patent fifty-three acres—Rogers' Inspection. Frederick, &c.* Know ye, that whereas, *William Rogers*, by his humble petition to our agent, for management of land affairs within this Province, did set forth, that a certain *John Boreing* had, on the 20th day of April, seventeen hundred and forty-two, surveyed and laid out for him a tract or parcel of land called *Boreing's Convenience*, lying and being in the county aforesaid, containing seventy-five acres, by virtue of an assignment for that quantity from *Thomas Sheredine*, being part of a warrant for four hundred acres, granted said *Sheredine* the twenty-fourth day of October, seventeen hundred and forty-one, as per the certificate thereof, taken and returned in the land office might appear ; the petitioner further showed that the said certificate had laid over since in the office postponed, and no patent had ever yet issued thereon, and as the two years for suing out such grant was expired, the petitioner was desired, that by sundry of our proclamations published, the certificate aforesaid was become null and void, and the land and premises therein mentioned subjected to the benefit of the first discoverer, and inasmuch as the petitioner was the first discoverer ; and desired to take up and pay for the same, humbly prayed a special warrant to resurvey the aforesaid tract,

with the liberty of adding any contiguous vacancy, and return of a certificate of such resurvey, he paying the caution money, and complying with all other requisites usual in such cases, might have our grant issue unto him thereon, which was granted him ; and accordingly a warrant on the twenty-seventh day of April, seventeen hundred and fifty-nine, unto him for that purpose did issue ; but the said warrant not yet being executed, it was on the eighteenth day of June, seventeen hundred and fifty-nine, renewed and continued in force for six months longer from that date, with liberty therein given to include a certain tract of escheat land called *Bold Venture*, contiguous to the former tract, originally granted unto a certain *John Oulton*, for one hundred and sixty-one acres, died seized thereof intestate, and without heirs, by which means the same became escheat to us, humbly prayed to be admitted to the purchase of the said escheat, being it escheat by the means aforesaid, for any or other ways or means whatsoever. In pursuance whereof it is certified in our land office that the aforesaid tracts or parcels of lands are surveyed, by which it appears that that tract called *Boreing's Venture*, clear of elder surveys, contains no more than the quantity of twenty-seven acres, and that that parcel of escheat land called *Bold Venture*, also clear of elder survey, contains no more than the quantity of twenty-one acres ; and that there is the quantity of five acres of vacant land added, for which he has paid, &c. We do therefore hereby grant and confirm unto him the said *William Rogers*, all them the aforesaid two tracts or parcels of land now resurveyed and called "*Rogers' Inspection*," beginning for the first mentioned part in the east line of a tract of land called "*Todd's Range*," and where the said east line of *Todd's Range* intersects the west side of "*Jones' Falls*," and running thence, bounding on and with the said east line of *Todd's Range*, east one hundred and ninety-eight perches, until it intersects the south-southwest, three hundred and twenty perches, line of the original escheat tract of land called *Bold Venture*, then bounding on and with that line south-southwest, twenty-nine perches, until it intersects the east line

of a tract of land called *Cole's Harbour*, then bounding on and with that line of *Cole's Harbour*, east sixty perches, until it intersects the north-northeast, three hundred and twenty perches, line of a tract of land called *"Mountenay's Neck,"* then bounding on that line to the end thereof, north-northeast forty-four perches, then west-northwest fifty-four perches, unto the end of the west-northwest, fifty-four perches, line of the original escheat tract, called *"Bold Venture,"* then south-southwest twenty perches, until it intersects the east, one hundred and eighty-one perches, line of a tract of land called *Garrow Barrow,* then bounding on that line reversed, of the same west one hundred and twenty-two perches unto the end of the south, six degrees west, thirty-seven perches, line of said land, then bounding on that line, reverse of the same, north six degrees east, twenty-nine perches and three quarters of a perch, until it intersects the east line of a tract of land called *"Hanson's Wood Lot,"* then bounding on that line, reverse of the same, west twenty-one perches and half a perch, until it intersects the south by west line of a tract of land called *Salisbury Plains,* then bounding on and with that line to the end thereof, south by west thirty-nine perches, then bounding and with the given line of *Salsbury Plains,* north forty-one degrees and thirty minutes west, ninety-one perches and half of a perch, until it intersects the given line of a tract of land called *Lunn's Lot,* and then with a straight line to the place of beginning; containing and laid out for fifty acres and the fourth part of an acre, more or less. Beginning for the other part at a bounded white oak standing near the side of the northwest branch of *Patapsco,* it being the second bounded tree of a tract of land called *Mountenay's Neck,* and running thence, bounding on the said land, east-southeast seventy-one perches, unto a creek of the said northwest branch, then bounding down with the said creek, south twenty degrees, west seven perches unto the mouth of said creek, then bounding upward on said northwest branch, the four following courses, viz : north fifty-eight degrees west, thirty-five perches, south eighty degrees west, sixteen perches, north seventy-four degrees west, ten perches, north

thirty-three degrees west, twenty perches, and then with a straight line to the beginning; containing, &c.; to have and to hold the same, unto him the said *William Rogers,* his heirs and assigns forever, in the year, viz. the feast of the Annunciation of the Blessed Virgin Mary and St. Michael, the Arch Angel, by even, &c.

And thereupon, the plaintiff and defendants, respectively, prayed the court in their respective parts, as follows:

### Plaintiff's Prayers from No. 1 to 16.

1st. If the jury shall find from the evidence that a patent was granted by the *State of Maryland* to *Alexander Mountenay* for *Mountenay's Neck,* on the 30th June 1663, and a deed from *Samuel Wheeler and wife* to *Daniel Jones,* of the 22nd March 1685, and the deed from *Blunt* to *Todd,* of the 4th October 1689, and the deed from *Todd* to *Hurst,* of the 3rd of March 1701, and the deed from *Todd* to *Charles Carroll,* of the 16th June 1701, and the deed of mortgage from *John Hurst* to *Richard Colegate,* on the 13th October 1702, the deed from said *Hurst* to *Thomas Sheridine* and *Thomas Sligh,* of the 19th March 1749, and the will of *Richard Colegate* of the 8th day of August, 1721, in favor of his two sons, *John* and *Thomas Colegate,* and a deed from the said *John* and *Thomas Colegate* to *Thomas Sheridine* and *Thomas Sligh,* of the 15th November 1750, a deed from *Thomas Sheridine* to *Thomas Sligh,* of the 26th June 1756, a deed from *Charles Carroll* to *Thomas Sligh,* of the 31st May 1759, the deed from *Thomas Sligh* to *Thomas Hammond;* and that said *Thomas Hammond* died before the Revolution, leaving *William Hammond,* his eldest son and heir at law, and that he inherited the land of his father *Thomas,* as such heir; and if the jury find the two deeds from the said *William Hammond* to *John Cornthwaite,* of the 20th September 1775 and of the 2nd of April 1779, and the two deeds from *John Cornthwaite* to *John Hammond,* of the 24th September 1779 and of the 7th June 1780, and the deed from *John Hammond* to *John Anderson,* of the 4th March 1795. And if the jury believe that *John Hammond* intermarried with the plaintiff in this case soon after said last mentioned deed, and

that she was the sister of *John Anderson.* And if the jury believe that said *John Anderson* departed this life about the year 1805, without ever having been married, and that said *John Hammond* also died soon after him, and that the plaintiff in this cause afterwards intermarried with a certain *R. Casey,* who also departed this life before the institution of this suit. And if the jury further find from the evidence that said *James Todd* was in possession of *Mountenay's Neck* as early as the year 1700, and that those claiming under said *Todd* have continued in possession of the same, or parts thereof, according to their deeds, or as they became entitled thereto by will or descent, down to the present time, and also the record of ejectment of 1703, that *John Hammond* was in actual possession of that part of *Mountenay's Neck* embraced in the deeds to him from *Cornthwaite,* during his life, and filled up on the water front of his lot, and in this way and by the wash from the upper ground through *Caroline* street, other land was made fast land, and added to his, and if he leased the same, or a part thereof, to *McDowal,* as stated in the evidence, and collected the rent from him; and that if, since the death of the said *Hammond,* those who claim under him have been in possession of the said property, and collected the rents thereof, or of such portions as have been leased, then if the jury believe the preceding facts, they are bound to presume a deed from said *Alexander Mountenay,* or those claiming under him, to said *Samuel Wheeler and wife,* and from said *David Jones* to said *Robert Blunt,* or his ancestor, for the tract of land called *Mountenay's Neck.*

2nd. And if the jury believe, in addition to the facts set forth in the above or first prayer of the plaintiff, that the square of ground between the *City Dock* and *Aliceana* street, and *Caroline* and *Spring* streets, was filled up and made fast land by the authorities of the city of *Baltimore,* under the ordinance of 1823, and the other ordinances given in evidence, and was completed about the year 1836, and the defendants were in possession thereof at the institution of this suit, then the plaintiff is entitled to recover.

3rd. If the jury believe the facts sets forth in the plaintiff's first and second prayers, and also, that plaintiff, and those under whom she claims, have been in possession of the part of said property, by having a house erected upon it, and by the actual enclosure of a board fence, then the defendants cannot avail themselves of any title from presumption, except of such part as they can prove that they have also been possessed of by actual enclosure for twenty years next before the impetration of the writ in this cause.

. 4th. That the defendants in this case cannot avail themselves of the benefit of a presumption of a grant to them for the property in dispute, unless they show by strong proof a continuous and uninterrupted possession thereof for twenty years next before the institution of this suit.

5th. That there is no evidence in this case to prove such possession.

6th. That the defendants cannot be allowed to avail themselves of any possession so as to defeat the title of the plaintiff, further than such possession is located on the plats in this case.

7th. That the acts and possession of any one of the said defendants cannot avail the other defendants by affording to them the benefit of a presumption of a grant.

8th. That before the jury can find a title in the defendants, or any one of them, by presumption of a grant from the plaintiff, or those under who she claims, they must believe in their conscience, and find as a fact, that such grant was actually made.

9th. And that such grant was made by the plaintiff to the defendants, by deed regularly executed and acknowledged.

10th. That if the jury believe the evidence in this case, they cannot presume a grant from the plaintiff, or those under whom she claims, to the defendants, or either, from any acts or possession of the defendants, given in evidence, between the years 1783 and 1823.

11th. That the title of the plaintiff cannot be affected by adding together the different possessions and acts of the de-

fendants, at long intervals, in point of time, so as to make out twenty years, nor can the possession of the defendants on the east side of *Caroline* street be connected with possession on the west side thereof, so as to make out the twenty years; but possession from which the presumption may be created, must be confined to the property in dispute.

12th. That the statute of limitations of *James* does not apply to the circumstances of this case, as stated in the evidence.

13th. If the jury find the patents, deeds and ordinances offered in evidence in this cause by the defendants, and that they were so offered by the defendants to show that they had the superior, better and more ancient right to extend, fill up, and improve in front of their own lots, than the plaintiff, and those under whom she claims, have in front of her lot, then no possession which has been proved in this case on the part of the defendants, or any of them, can give rise to a presumption of a grant to the defendants from the plaintiff, as the claim of a better title on the part of the defendants than the plaintiff ever had, if the jury find such claim, is wholly inconsistent and at war with such presumption.

14th. That if the jury believe that *Island Point* was resurveyed and other land added to it by *William Fell* in 1761, and that the whole were included in one tract under the name of *Fell's Prospect*, and that a patent of the same was granted to said *Fell* at the above date, and if they believe from the fact that the defendants have offered in evidence the said patent in this cause, as part of their title that they cannot now claim under the patent of *Island Point*, as a subsisting independent patent, but they must claim, if at all, by the relation to it of the patent of *Fell's Prospect*.

15th. That, even if the jury should believe from the evidence that *Thomas Sligh* claimed under the escheat patent of *Mountenay's Neck* to *Edward Fell* in the year 1737, still the said *Thomas Sligh*, and those claiming under him, have a right to go back by relation to the original patent of *Mountenay's Neck* in 1663, and to date their title from that period.

16th. The plaintiff further prayed the court to instruct the jury, that if they shall believe the evidence offered in this case

by the plaintiff and defendants, then they may and ought to presume a deed from *A. Mountenay*, or his heirs, to *Wheeler and wife*, and from *Daniel Jones*, or those claiming under him, to *Robert Blunt*, or his ancestor, for the tract of land called *Mountenay's Neck.*

### Defendants Prayers, *No.* 1 *to* 4.

1st. That if the jury find that the tract called *Bold Venture* was granted as given in evidence by the defendants, and that the same is truly located on the plats in the cause by defendants, that then the patent of *Mountenay's Neck* gives no title to the lessors of the plaintiff to the lot of ground for which the defendants have taken the defence on the plats.

2nd. That if the jury find the existence of the grants of *Long Island Point* and *Island Point*, offered in evidence by the defendants, and that the location of the first tract of those is as made by defendants, and the location of the latter is according to either of the locations of the same as made by the defendants; and if they also find, that in 1734, when the survey of said latter grant was made and the patent granted, the water of the *Patapsco* ran up to and adjoined the line of said tract, according to one of the locations thereof aforesaid, that is to say, the line from red K to red L, or run east of that line, that then the defendants, and those under whom they claim, were as between themselves and the lessors of the plaintiff, and those under whom they claim, the elder riparian owners of the water lots on *Bond* street, in front of which, the lots run in controversy, included within the defendants defence on the plats in the cause, to the legal ownership of the plaintiff of the lots on *Wilkes* street; and if the jury find those facts, that then the plaintiff is not entitled to recover.

3rd. That if the jury find the existence of the grants of *Long Island Point* and *Island Point*, offered in evidence by defendants, and that the location of the first of these tracts is as made by defendants, and the location of the latter is according to either of the locations of the same as made by defendants; and if they also find, that in 1736, when the survey of said latter grant was made and the patent granted, the water

of the *Patapsco* river ran up and along the line of said tract, according to either of the locations thereof aforesaid, that is to say, the line from red K to red L, or ran east of that line; and if the jury shall also believe that *Mountenay's Neck* rightfully escheated, that then defendants, and those under whom they claim, were as between themselves and the lessors of the plaintiff, and those under whom they claim, the elder riparian owners of the water lots on *Bond* street, in front of which the lots now in controversy, included within the defendants defence on the plats in the cause to the ownership of the plaintiff of the lots on *Wilkes* street, and if the jury find these facts, then the plaintiff is not entitled to recover.

4th. If the jury find that the tracts of land aforesaid, *Bold Venture*, *Long Island Point* and *Island Point* and *Fell's Prospect* were granted, as offered in evidence by defendants, and that the locations thereof as made by defendants are correct; and if they also find that the defendants, and those under whom they claim, have, from the year 1795 to the present time, been claiming and being in possession of the lots on *Bond* street, numbered from 5 to 9, as those lots are located on the plats in the cause, and always also claimed the right to improve their said lots by extending them into the water, under the authority of the Act of *Maryland* of 1745, ch. 9, and to be entitled to the land which might be so made out of the water in front of said lots; and if the jury further find, that one of the owners of said lots, that is, lot No. 5, in the year 1795, extended the front of his said lot from D to L, claiming to have the right to do so as aforesaid, and took possession thereof, and he, and those claiming under him, ever since exclusively held and owned the same as the fee simple owners thereof; and if they further find, that afterwards, in the assertion of the same right, the defendant, *Inloes*, claiming to have the right to do so, and to be entitled to the land which might be made by him in front of the said lot owned by him, erected the fence from P to Q, in the rear of the said lot No. 5, for the avowed purpose, by means thereof to intercept all the wash or sediment which, from any cause, might come down against the

said fence, and to cause the same to settle there, and convert the water there then into land, as a part and parcel of said lot No. 5 extended, and also throughout openly declared that he had and claimed the right, if the city would permit it, and would, as soon as they did permit it, carry and extend his said lot over and across *Eden* street and as far as *Canal* street; and if they also find, that when said fence was so as aforesaid made by *Inloes*, the city of *Baltimore* had passed its ordinance of the 1st May 1801, given in evidence by defendants; and if they find, that from time to time the washings and sediments aforesaid settled in and along said fence from P to Q, so as to make portions of the same dry land as late as 1810, and that as soon as the same became land, the same was taken possession of by *Inloes* claiming title to the same, and using it absolutely as his own; and if they further find, that for the like purpose of making the whole of his said lot to extend to the limits of said fence, he caused dirt from time to time, from 1805 to 1818, to be hauled and deposited along the same, and in that way, with the aid of the washings deposited in the same place, to convert the same into land, and that as the same was so made, he took possession thereof, and used, and claimed title to the use of the same; and if they further find, that the city afterwards passed the ordinances of the 24th March 1813, 25th March 1814, 25th May 1816, 11th March 1823 and 13th April 1826; and if they also find, that the city acted under said ordinances, and went on from time to time to make the improvements contemplated by the same in that part of the property on the plat which lies between *Lancaster* and *Aliceana* streets on the north and south, and *Canal* street on the west, and *Bond* street on the east, to and with the aid and at the expense, as far as the same was charged to individuals, of the defendants, and those under whom they claim, on account of the lots aforesaid on *Bond* street; and if they further find, that as soon as the said ground was made by all those conjoint means, and from time to time as the same was made, the defendants, or those under whom they claim, took adversary possession of each and every part thereof, lying annexed to

and in front of their said several lots on *Bond* street, and that as streets were opened over and across to them, they paid the assessment upon said property, levied by the city authorities for the making of such streets, and they also paid all the other taxes which have been levied upon said property since the same was made, and always, during all of said period, claiming title to said property, and being in the adversary use and possession thereof; and if they further find, that during the said period the said defendants, and those under whom they claim, always asserted their right to extend their said lots on *Bond* street east to *Canal* street, and that such claim of right and such possession of the property as was from time to time taken by them, and such means as were adopted by them to make such extensions, were all notorious and well known to the lessors of the plaintiff; and if they further find that plaintiff, or those under whom she claimed, never claimed or used her or their right to extend her said lot on *Wilkes* street further than *Aliceana* street, and never gave any notice to the defendants or those under whom they claim, that when the particular property in dispute should by them, at their expense, be made, that she would claim title to the same, or in any manner disturb the right and interest of the defendants, or those under whom they claim in said property when the same should be made, and that they never have paid or offered to pay the taxes on the same ; and if they further find that *Chapman*, one of the defendants, in the year 1826 or 1827, built the glass house at the corner of *Caroline* and *Lancaster* streets, and has, until the institution of this suit, held peaceable possession of the same, claiming title to the same ; if they also find that *Hammond* and *Pinkney's* heirs claiming title to the lots on *Wilkes* street immediately north of that part of the property made as aforesaid by defendants, which lies between the west side of *Caroline* street and *Spring* street, together with a certain *Klinefelter*, took up said part of said property, and the square lying immediately west thereof, and running into *Canal* street, as vacant land, without they, the said *Hammond* and *Pinkney's* heirs, claiming the same by virtue of their title to

61    v.1

the said lots on *Wilkes* street; and if they further find that neither said plaintiff nor any other proprietor of the lots on *Wilkes* street have ever paid or tendered to pay to the defendants, or any one else, the expense of making said property; that then, first, the lessor of the plaintiff is barred by the statute of limitations from recovering in this suit the land included within the lines of the defendants defence as located upon the plats; or if not so barred, that then, second, the jury may and ought to presume that the proprietors of that part of *Mountenay's Neck* lying immediately north of the first line of that tract, as located on the plats from black M to black N, and immediately north of the ground so made as aforesaid by the defendants, and those under whom they claim, which was adjoining to and immediately west of the defendants lots aforesaid on *Bond* street, as far as and including the whole of said ground embraced in the defendants said defence, have granted the same to the defendants or those they claim under; or third, that then they may and must presume that the patent of *Mountenay's Neck*, in whom, at any time prior, riparian right to improve under the said act of 1745, or those claiming under them, may have existed, had surrendered and granted to the defendants, or those under whom they claimed such right, so as to authorise and entitle said defendants, and those under whom they claim, to improve, to the exclusion of such and those claiming under him, their said lots on *Bond* street to the same purpose and with the like effect as if they, the said defendants, and those they claim under, were, by virtue of grants from the State, the riparian proprietors of said lots prior, in point of time and right, to the said patentee and those claiming under him of *Mountenay's Neck*.

Whereupon the court granted the first and sixteenth prayers of the plaintiff, and rejected her prayers numbered from two down to fifteen inclusive, and rejected the first, second and third prayers of the defendants, and granted their fourth prayer; to the granting of the fourth prayer of defendants, and to the rejection of her prayers from two to fifteen, the plaintiff excepted, and to the granting of first and sixteenth of plain-

tiff's prayers, and to the rejection of their first, second and third prayers, the defendants excepted.

4TH EXCEPTION. The court having decided, as stated in the preceding exception, upon the several prayers of the plaintiff and defendants, the plaintiff gave in evidence the deed from *Samuel Wheeler* and *Ann* his wife, to *David Jones*, of 22nd March, 1685, heretofore offered by defendants, and it being agreed that all the evidence in the prior exceptions should be considered as a part of this exception, the plaintiff, by her counsel, prayed the court to instruct the jury, as follows :

1. That there is no evidence of adverse possession, for twenty years before the institution of this suit ; and that the plaintiffs are not barred by any possession which the defendants or any of them have proved.

2. That the bar of adversary possession cannot apply in this case, unless it be shown to have been defined and uninterrupted ; and that the defendants are not entitled to any portion of the land in controversy, not included in such definite and uninterrupted possession, and except so far as the defendants shall have shown such possession, and for the term of twenty years before the bringing of this suit.

3. That if the jury believe that the land in controversy did not become fast land, so that the water did not flow over it at ordinary tides, within twenty years before the bringing of this suit, then no adversary possession thereof can be found to bar the plaintiff's recovery.

4. That there is no evidence in this case from which the jury are at liberty to presume that any deed or grant was ever made by the lessor of the plaintiff or those under whom she claims, of the land in controversy, or the right to extend into the water.

5. That the jury cannot presume any such deed or grant, if they believe that the defendant *Inloes* claimed the right to extend his wharf, by virtue of his ownership, under title from his father, of the land on *Bond* street, and with permission of the city.

6. That the jury, to make the presumption of a deed or grant as above mentioned, must be satisfied that in point of fact a deed was executed by the plaintiff's lessor, or some one under whom she claims, of their interest in the land in controversy, or their right to extend the land into the water to the defendants, or some one of them.

All of which prayers the court (ARCHER, C. J.) refused to grant. The plaintiff excepted.

5TH EXCEPTION. The counsel for the plaintiff further prayed the court to instruct the jury upon the evidence given, as stated in the preceding bills of exceptions, which is to be taken as a part of this bill of exception, that there is no evidence in this cause that any one of the defendants, except *Inloes* and *Chapman*, ever had possession of any portion of the property in dispute, even for a day, or made any entry into it, previous to the time when it was filled up and made fast land by the city of Baltimore in the year 1836, or when the jury may find that it was filled up; that there is no evidence that *Chapman* ever had possession of any of said property, or exercised acts of ownership over it previous to about the year 1826; and that if the jury believe the facts set forth in the plaintiff's first, second, and third prayers, then the plaintiff is entitled to recover against all the defendants except *Inloes*; which the court (ARCHER, C. J.) refused to grant. The plaintiff excepted.

6TH EXCEPTION. The patents and deeds of records offered in evidence by the plaintiff, being offered, subject to all exceptions to which the same might be liable, the defendants, by their counsel, objected to the admissibility in evidence of each and every of said patents, deeds, and records; but the court overruled the objection, and suffered each and every of said patents, deeds, and records to be given in evidence to the jury. The defendants excepted.

The parties then filed the following agreement, to wit:

It is agreed that the plats on file in this case, or made for the parties, may be used to every effect in the Court of Appeals, as if the same were copied and sent up with the record; and that the explanations in like manner may be used; and

that neither the plats nor the explanations need be copied into the transcript for the Court of Appeals. It is agreed, also, that the plat of the city designating the improvement to be made under the ordinance of 1823, may be also used without being copied with the transcript, and likewise the plat of *Fell's Addition* to *Baltimore* town, of 1773; and that all the ordinances and laws given in evidence in the above case may be read in the Court of Appeals from the printed laws and ordinances, and that the same shall not be copied in the record. It is also agreed that the plot from the City Atlas of 1824, offered in evidence, shall not be inserted into the record, but a copy of the same, by *A. J. Bouldin,* may be used in the Court of Appeals.

The verdict and judgment being against the lessor of the plaintiff, she appealed to this Court.

*Explanations of the plot published with this report, which however only contains such portions of the survey, as give a general view of the controversy.*

1. The plaintiff claimed from W to X, then to the water of the City Dock, then bounding on the water of the Dock to *Caroline* street, and then on *Caroline* street to W.

2. The defendant took defence for all the land lying between the *W.* side of *Caroline,* and *E.* side of *Spring* street, and the *S.* side of *Aliceana* street, and *N.* side of *Lancaster* street.

3. M is the admitted beginning of *Mountenay's Neck,* as surveyed in 1737, for *Wm. Fell,* and the *N. W.* line from that point, is its first line.

4. *Bold Venture* was located by the plaintiff in three ways. The first line of which was from the southern A to M, and located as a tract for 161 acres. It was also located as clear of elder surveys according to the recitals in the patent of *Rogers' Inspection,* of the 28th Sept. 1759, in two other modes, the lines of both of which parcels are clear of this controversy, and do not affect it. In that patent the original grant is assumed to have encroached on elder surveys.

5. V to W to X and Y, shew the permission of the *Port Wardens of Baltimore* to *John Hammond,* in 1784, to extend his improvements into the water west of *Caroline* street, to the *Port Warden's* line on the south.

6. The deeds from *John Cornthwaite* to *William Hammond,* were so located by the plaintiff as to show a claim to the water line of the river at Y and V, the water at one time flowing to the shore at those points.

7. The defendants located W to X to 109 to 110 and to W, as being in their possession.

8. The defendants located *Bold Venture* as beginning at the southern A, and thence to M, and with the line from M to N, so as to include a part of the City Dock, and as conforming to the original grant for 161 ac's.

9. The line of the water as it flowed in 1783, is shown by the dotted lines from A to Y, V, B, C, F, according to the depositions of *E. Smith* and *William Dawson* for the plaintiff.

10. The line of the water as it flowed in 1801, according to defendants depositions, is shown by the dotted line south of the preceding line from G to F.

11. The dotted line from L to O shows the line of logs run out by *Joshua Inloes.*

12. The dotted line from P to Q west, shows the water-fence as extended by *William Inloes.*

13. The numbers 5, 6, 7, 8, 9, show the leases from *Ann Fell,* on *Bond* street ; No. 5 being to *Abraham Inloes.*

14. No. 1 to 11 shows the water in 1734 *W.* of the leased lots which are located on the original plats with shaded lines as bordering on the water.

15. No. 10, located as the lease from *John Hammond* to *Thomas Mc-Dowall,* 28th February, 1798.

The cause was argued before DORSEY, CHAMBERS, and SPENCE, J.

By MAYER and DULANY for the appellants, and
By GILES and McMAHON for the appellees.

DORSEY, J., delivered the opinion of this court.

With the county court's refusal to admit the testimony offered by the plaintiff in his *first* bill of exceptions, and objected to by the defendants, we entirely concur. It was immaterial and irrelevant to any of the issues in the cause. A prevalent opinion in the neighborhood, even if known and adopted by the lessor of the plaintiff, as to her legal rights, whether founded in error or not, does not at law prevent the running of the statute of limitations, nor repel the legal presumption of a grant arising from adverse possession, long continued and acquiesced in.

We also concur with the county court in admitting to the jury the certificate of the rent roll, offered in evidence by the

defendants, as stated in the plaintiff's *second* bill of exceptions. The rent rolls, which are books kept in the several counties of the State during the Proprietary Government of *Maryland,* by officers called rent roll keepers, were designed to show, in the respective counties, the grants of land made by the Lord Proprietary; the names of the subsequent alienees thereof; and the names of those who were in possession of the same; and the quit-rents with which they were chargeable. In all cases of controverted possession, or where possession was relied on as evidence for the presumption of a grant, certified extracts from the rent rolls, showing who were the possessors of the lands at the period in question, have been received by the courts of *Maryland* as competent testimony. But though the evidence objected to was admissible, after the testimony previously given in the cause, it is difficult to conceive why it should have been offered by the defendant,; or if offered, why objected to by the plaintiff. If adduced as evidence of the escheat grant to *William Fell,* it could neither benefit the defendant nor damnify the plaintiff; as the escheat patent itself, which is conclusive evidence of the fact, had already been in evidence before the jury. And if it were produced as evidence of *William Fell's* possession under his escheat grant, so far as it proved any thing, it disproved that fact, by showing that he never was in possession under his escheat grant, and that no quit-rents had ever been charged against him. It would be extremely difficult to account for the rent roll keeper's wholly omitting to charge *William Fell* with the quit-rents as the possessor of *Mountenay's Neck,* upon any other hypothesis, than that upon an investigation into the subject by the rent roll keeper, he discovered (what the testimony in this cause renders more than probable,) that *William Fell* took nothing under his escheat, and consequently was not charged with the payment of quit-rents. But the effect of this rent roll extract is not only to disprove that *William Fell* was the possessor, or chargeable with the quit-rents of *Mountenay's Neck,* but it shows that previous to the year 1756, and more than two years before the conveyance from *Edward Fell* to

*Thomas Sligh, Thomas Sligh* and *Thomas Sheridine* were the possessors of *Mountenay's Neck,* and charged with the quit-rents payable thereon. Facts strongly corroborating (if corroborating testimony were wanting,) the evidence the plaintiff had before offered in support of his claim and pretensions.

The plaintiff's counsel, by the *first* prayer in the *third* bill of exceptions, call upon the court to instruct the jury, that, if they believe the facts enumerated in the prayer, "they are bound to presume a deed from said *Alexander Mountenay,* or those claiming under him, to *Samuel Wheeler and wife,* and from said *David Jones* to said *Robert Blunt,* or his ancestor, for the tract of land called *Mountenay's Neck.*" These enumerated facts do not show that the plaintiff, or any of those under whom she has offered evidence of her deduction of title, ever held under either *Wheeler and wife,* or *Jones,* or received from them any conveyance of *Mountenay's Neck,* or that they, or either of them, ever were possessed of any part thereof. The only fact tending in the slightest degree to connect *Wheeler and wife* and *Jones* with the tract of land called *Mountenay's Neck,* is the isolated deed from *Wheeler and wife,* by *Thomas Lightfoot,* their alleged attorney, to *David Jones.* In the absence of all proof that *Wheeler and wife* were entitled to the land, or had been in possession of any part thereof, or that *Robert Blunt,* or those claiming under him, ever acquired, or claimed to hold title or possession under either *Wheeler and wife* or *Jones,* upon what ground could the court be called on to direct the jury to presume a deed from *Alexander Mountenay,* or those claiming under him to *Wheeler and wife,* and from *David Jones* to *Robert Blunt?* There is not a scintilla of evidence from which it can be legitimately inferred that *Blunt* derived either title or possession from *Jones,* or that *Wheeler and wife,* or *Jones,* or any person claiming under them, were at any time in possession of the land in question. Upon what basis then could the plaintiff rest the presumption, which she demanded of the jury through the agency of the court?

Had the plaintiff have required of the court an instruction to the jury, that they must presume a deed for *Mountenay's*

62    v.1

*Neck*, from *Alexander Mountenay*, or those claiming under him, to *Robert B. Blunt*, it would be difficult to discover a reason why it should not be granted. From *Robert B. Blunt* the paper or record title of the plaintiff was perfect, the only link, in her chain of title, which was wanting, was that from *Alexander Mountenay* to *Robert B. Blunt*. To supply this defect, by way of legal presumption, all that was requisite was to prove to the jury a continuous possession of twenty years or upwards, in *Robert B. Blunt*, or those claiming under him. And of this fact there was abundant proof. Far more than from the antiquity of the possession proved, and nature and circumstances of the case, could reasonably have been required or expected. The conveyance of *Robert B. Blunt* to *James Todd*, for *Mountenay's Neck*, bore date on the fourth day of October, in the year sixteen hundred and ninety-five. Of *Robert B. Blunt's* possession, no direct proof has been offered; and none could reasonably be expected, after a lapse of nearly one hundred and fifty years. But of the possession of his grantee, *James Todd*, there is proof, and that too coming in such an unquestionable shape, that it cannot be doubted. About three years after the date of the deed from *Blunt* to *Todd*, on the 17th of February 1698, the surveyor of *Baltimore* county, a public officer of the Lord Proprietary, who was upon the land and an eye witness of what he stated, who could have had no motive for misrepresentation, in the discharge of a necessary official act in respect to the survey of the tract of land called "*Todd's Range*," certifies to the register of the Land Office, that it began "at a bounded white oak, standing in the line of a parcel of land formerly belonging to *Alexander Mountenay*, and now in the possession of the aforesaid *Todd*." On the 13th of March 1701, *James Todd* conveyed that part of *Mountenay's Neck*, connected with the present controversy, to one *John Hurst*, who, by deed of mortgage bearing date on the 13th day of October 1702, to secure the payment of £123, 6s. 4d., conveyed the same to *Richard Colegate*, who, in the Provincial Court of the April term 1705, recovered judgment in ejectment for the said mortgaged premises against said *Hurst*; but no

writ of *habere facias possessionem*, as far as the record disclos-es that fact, appears to have issued thereon. The institution of this action of ejectment to April term 1704, by *Colegate* against *Hurst*, is evidence that *Hurst* was, at that time, in pos-session of the mortgaged premises; as had they, at that time, been in the possession of any other person, the judgment could have been of no avail to the plaintiff. And the declaration describes the mortgaged premises sued for as late in the tenure or occupation of *James Todd*, of the aforesaid county, planter. Thus confirming, as to *Todd's* possession, the previous certi-ficate of the surveyor of *Baltimore* county.

In March, 1749, *John Hurst*, in consideration of £5, con-veyed to *Thomas Sheridine* and *Thomas Sligh*, as joint ten-ants, the same lands conveyed to him by *James Todd*. And on the 15th of November, 1750, in consideration of £100 sterling, *John* and *Thomas Colegate*, devisees of *Richard Cole-gate*, conveyed the same lands to said *Sheridine* and *Sligh* in joint tenancy. Whether the possession continued in *Hurst* till his conveyance to *Sheridine* and *Sligh*, or had previously passed from him to the *Colegates*, in this question of presump-tion of a deed, is of no importance; the plaintiff deducing a regular paper title from both, the possession of either is equal-ly available to the plaintiff. And there is not a shadow of proof that the possession was in any other person.

In June, 1756, *Thomas Sheridine*, the elder, being dead, his son and heir-at-law, *Thomas Sheridine*, conveyed the said lands to *Thomas Sligh*, reciting in part the said conveyance from said *John* and *Thomas Colegate* to *Thomas Sheridine*, the elder, and *Thomas Sligh*, and that the said *Thomas Sheridine* and *Thomas Sligh*, in virtue of the said conveyance, were jointly "seized and possessed" of the said lands, and that his said father died "so seized and possessed, living the aforesaid *Thomas Sligh*," "who now continues, as survivor, seized, and yet is actually possessed of the aforesaid lands." For falsely making such a recital, *Thomas Sheridine*, the younger, as far as the record discloses, could have had no conceivable motive.

The extract from the debt books is evidence that *Thomas Sligh*, in 1754, was in possession of 100 acres, part of *Mountenay's Neck;* and the extract from the rent roll, given in evidence by the defendants, shows that in 1756, if not before, *Thomas Sligh* and *Thomas Sheridine* were stated by the rent roll keepers of *Baltimore* county, to be the possessors of 200 acres of *Mountenay's Neck.*  And the said extract from the debt books show, that from 1755 inclusive, till the year 1759, when he conveyed a part thereof to *Thomas Hammond,* (under whom the plaintiff claims,) *Thomas Sligh* was possessed of the said 200 acres, part of *Mountenay's Neck.*  For a period then of sixty years, that is, from 1698 to 1758, the plaintiff has shown a continuous possession in those under whom she claims title.  A stronger case for presuming a deed, on the ground of possessions of an ancient date, has rarely occurred in a court of justice.

But it is said that possession is a matter of fact which must be proved by the same kind of testimony requisite for the proof of any other fact or occurrence.  To this proposition, as applicable to the case before us, we cannot assent.  If the possession relied upon were of modern date, so that it might fairly be presumed as susceptible of proof by living witnesses, then would the objection urged present itself with imposing force.  But as to the possessions in question, they are of so great antiquity, that the brevity of human life demonstrates that such testimony cannot be obtained.  If the certificate of the surveyor be not evidence in this case, upon what principle is it that entries in the debt books are evidence to prove ancient possessions of lands?  And if the recitals, in these deeds, as to possessions, be not evidence, upon what principle is it that you admit hearsay evidence of ancient boundaries or runnings of the lines of old tracts of land?  Or, how is it that you admit entries made in the books of a third person by the person whose duty it was to make them, and to whom no inducement to have made false entries could be imputed?  In *Mima Queen and child vs. Hepburn,* 7 *Cranch,* 290, the Supreme Court decided that hearsay evidence is incompetent to establish any

specific fact, which is in its nature susceptible of being proved by witnesses who speak from their own knowledge. But what must we presume would have been their decision, if, of facts of great antiquity, resting wholly in parol, of which no written evidence can be presumed to exist, hearsay evidence should have been offered? Why, that it was competent. The recitals here relied on are all made by persons wholly uninterested in the truth or falsehood of the facts recited.

It is also insisted that the plaintiff is precluded from relying on these possessions as furnishing a presumption for a deed from *Mountenay*, or those claiming under him, to *Blunt*, because *Thomas Sligh* having, in 1758, accepted a deed of conveyance from *Edward Fell*, the plaintiff, who makes title thro' *Thomas Sligh*, is estopped from setting up a title paramount, or alleging that she derived no title under the conveyance from *Fell* to *Sligh*. If this doctrine of estoppel, as here contended for, be sanctioned, the condition of *Sligh*, and those claiming under him, is deplorable indeed. *Sligh* is as thoroughly estopped by the deed from *Hurst*, and also by that from the *Colegates*, as he is by that from *Fell*. Their seniority or juniority neither adds to, nor detracts from their several efficacies as estoppels. If he sets up a title under the deed from *Hurst*, the reply would be, you have accepted a deed from the *Colegates* or *Fell*, and you are estopped from asserting a title derived in any other way. If he asserts his title under the *Colegates*, the deed accepted from *Hurst* or *Fell* would present to him a barrier equally unsurmountable. And the same would be the effect of either of the deeds from the *Colegates* or *Hurst*, if his title were insisted on under the deed from *Fell*. So that having made separate purchases of the titles of three claimants, he has no title at all; but if he had taken a deed from only one of them, he might perhaps have acquired an indefeasible title. The inconsistency and injustice of applying the doctrine of estoppel to a grantee, who claims nothing under the deed which he seeks to repudiate, cannot be more strongly illustrated than when attempted to be applied to a case like the present, where it is manifest that *Sligh* never, for a moment,

supposed, that in taking a conveyance from *Fell* he designed to relinquish and abandon all the title to *Mountenay's Neck,* which he had acquired under the deeds from the *Colegates* and *Hurst;* and to admit that thenceforth he claimed no other title to *Mountenay's Neck* than that transferred to him by *Edward Fell.* That such was not the understanding of *Edward Fell,* is apparent from the terms of the deed, which do not profess, in the usual form, to convey the land itself; but simply the right, title and interest of *Fell* therein. In taking a conveyance from *Fell, Sligh's* only object was to purchase his peace, or remove a cloud which overshadowed his title. The difference in the amount of purchase money paid to the *Colegates* and *Fell,* fully sustains this view of the transaction. To the former, for their title, was paid £100 sterling; to the latter, £50 current money. The deed from *Fell* to *Sligh* has performed its office, and consummated the contract between the parties. *Fell* has received his £50, and *Sligh* obtained as its equivalent the asserted claim of *Fell.* The deed between them never was designed to have any further or prospective operation; to all intents and purposes it is *functus officio.* That the distinction which we have taken, as respects estoppel, when applied to a conveyance of the land itself, and the mere interest of the grantor in the land, is well founded. See 4 *Ba. Abr.* 192, Tit. leases and terms for years, letter O, and the authorities there referred to, where it is stated, that, "if a man takes a lease for years, of the herbage of his own land, by indenture, this is no conclusion to say, that the lessor had nothing in the land at the time the lease was made, because it was not made of the land itself."

The true ground upon which estoppels are applied to deeds is given in the case of *Jackson, ex dem of Varick, vs. Waldron and wife,* 13 *Wendel,* 178, where it is said, that "the true principle of estoppel, as applicable to deeds, is to prevent circuity of action, and to compel parties to fulfil their contracts; thus, a party in a deed asserting a particular fact, and thereby inducing another to contract with him, cannot, by a denial of that fact, compel the other party to seek redress, against his

bad faith, by suit; but the court will decide upon the rights of the parties, without subjecting them to the expense and delay of a new litigation; and this they will do, not on the ground of conluding the parties from showing the truth, but because the whole truth being shewn, the justice of the case is not changed." And in *Blight's lessee vs. Rochester,* 7 *Wheat.* 547, a most able exposition of the doctrine of estoppel is given by Chief Justice *Marshall,* showing that it does not or ought not to apply as between grantor and grantee, and preclude the grantee from showing a prior and superior title in the grantee, to that transferred by the deed of the grantor. The true doctrine upon the subject is also correctly stated in 4 *Ba. Abr.* 190, Tit. leases and terms for years, letter O, as follows: "but if such lease for years were made by deed poll of lands, wherein the lessor had nothing, this would not estop the lessee, to aver that the lessor had nothing in those lands at the time of the lease made, because the deed poll is only the deed of the lessor, and made in the first or third person; whereas the indenture is the deed of both parties, and both are, as it were, put in and shut up by the indenture; that is, where both seal and execute it, as they may and ought; for otherwise, if the lessor only seals and executes the indenture, the lessee seems to be no more concluded, than if the lease were by deed poll; for it is only the sealing and delivery of the indenture, as his deed, that binds the lessee, and not his being barely named therein, for so he is in the deed poll; but that being only sealed and delivered by the lessor, can only bind him, and not the lessee, who is not to seal and execute it. And it should seem, that such lease by deed poll binds the lessor himself as much as if it were by indenture, because it is executed on his part with the very same solemnity, and therefore it should seem, he is bound by such lease by way of estoppel."

We think the county court, therefore, *erred* in granting the plaintiff's *first* prayer in the *third* bill of exceptions.

The *second* prayer of the plaintiff, in the *third* bill of exceptions, involving in it the decision of most of the defendants'

prayers, we will forbear to express any opinion upon it till we have disposed of the defendants' prayers.

The plaintiff's *third* prayer in this bill of exceptions calls on the court for an instruction to the jury, that if, in addition to the facts stated in the first and second prayers, they also believe, "that the plaintiff, and those under whom she claims, have been in possession of the part of said property, by having a house erected upon it, and by the actual enclosure of a board fence, then the defendants cannot avail themselves of any title from presumption, except of such part as they can prove that they have also been possessed of, by actual enclosure, for twenty years, next before the impetration of the writ in this cause." And this prayer, we think the county court ought to have granted, if it be assumed that, but for such presumption, the plaintiff is entitled to the property in controversy. The general principle being now too well established to require the adduction of authorities in its support, that a *possessio pedis* of part of a tract or parcel of land, by him, who is legally entitled to the entirety, carries with it the possession to the extent of his legal rights: and no wrong-doer can, in contemplation of law, by entry or the exercise of acts of ownership thereon, acquire the possession of any part thereof, but by actual enclosure, or ouster, actual or presumptive. But such an assumption of title in the plaintiff cannot be made, as we shall hereafter show, and therefore the prayer was properly rejected by the court.

The instruction required by the plaintiff's *fourth* prayer was, "that the defendants in this case cannot avail themselves of the benefit of a grant to them for the property in dispute, unless they show by strong proof, a continuous and uninterrupted possession thereof for twenty years, next before the institution of this suit." This prayer, we think, the county court erred in not granting. Uninterrupted, continuous possession is essential to the presumption of a grant, and by "strong proof," was meant nothing more than such proof as would satisfy the jury of the existence of the fact, for the establishment of which it was offered.

The *fifth* prayer was, "that there is no evidence in this case to prove such possession." The object (the meaning) of which proposition was, that the evidence before the court was not sufficient to authorise it in instructing the jury to presume a grant to the defendants. After a minute and thorough examination of all the facts in the case, and of the law which applies to them, we are of opinion, that this instruction ought to have been granted. The grounds, upon which rest the presumption of a deed, are, that the rightful owner has so long submitted to acts of ownership over his property exercised by another, without ever having sued for the recovery of his property, or of damages for the unlawful invasions of his rights, that he is presumed to have granted them to him by whom the acts of ownership are exerted. Let us now see how far this presumption is applicable to the case before us, and ought to be insisted upon by the present appellant. To do this, we must bear in mind that the property, of which it is sought to deprive her, was not at the time of the alleged encroachments upon her rights, her freehold, or any tangible or visible property, or a franchise, or easement, of which she then had the capacity of enjoyment. It was a mere privilege of acquiring property by its reclamation from the water, and until reclaimed she had no property; no possession; no right which could be violated or encroached upon by any body. *Inloes'* fence, which from its duration is the only trespass or possession relied on as the basis of this presumption, it must be borne in mind, was erected in navigable water, and far without the limits of the land owned by the appellant. What action could the plaintiff, or those under whom she claimed, have maintained on account of the erection of *Inloes'* fence? Ejectment would not lie, there being no title in the land. Trespass, in which the law implies an injury, whether sustained or not, could not have been maintained, by reason of the want of ownership of soil, whereon the fence was erected. An action on the case could not be supported, because the gist of such action is actual damage or loss to the plaintiff; and the erection of *Inloes'* fence, so far from inflicting damage or loss, conferred a sub-

63     v.1

stantial benefit, by aiding in the consummation of what was indispensable to the fruition of the valuable franchise with which the plaintiff had been invested by the laws of the State and ordinances of the city of *Baltimore.* Upon what principle then of reason, justice, common sense, or analogy, can this doctrine of presumptive grants be applied to the case now before us?

But the nature and extent of the interest acquired by improvers, under the act of 1745, ch. 9, and the state and condition in which the improvement must be, before any right of property vests in the improver, under the Act of Assembly, does not now, for the first time, arise in this court. The decision in the case of *Giraud's lessee vs. Hughes and al,* 1 *Gill & John.* 251, unless overruled, is decisive, in the plaintiff's favor, of the question we are now considering. There, *Christopher Hughes* being the owner of the land running to the water, the defendants, on whom his interests devolved, claimed title to the land in dispute, as being an improvement made by his tenant, under the acts of 1783, ch. 34, and 1745, ch. 9; and proved that his said tenant had, in pursuance of the provisions of said Acts of Assembly, made the said improvement (which was a wharf,) so far as to enclose the same, by the necessary logs, in 1789, and had the wharf filled up in the middle and north side thereof, and partly so on the east and south parts of the same; but that the logs of the said wharf, so made, had, "by injuries and decay in several parts, fallen down, (the top log entirely around,) and have not been repaired since: that part of the ground, filled up within the logs, had been, and still is, used and occupied as a distillery of turpentine; and that the water flows all round over the logs of said wharf, and within the same, from ten to twenty feet, according to the state of the tides." That in 1789, his said tenant having moved off, the said *Christopher Hughes* took possession of the premises, and by himself, his tenants, and the defendants, his heirs-at-law, held the said wharf ever since, till the trial of the cause in 1828. In that cause, the Court of Appeals decided, that, in order to vest any title in the wharf, it

must be completed; and that by reason of such incompletion of the improvement, neither *Christopher Hughes*, nor his tenant, had acquired any title thereto, under the said Acts of Assembly. Without overruling this decision, can it, for a moment, be contended that *William Inloes*, by erecting and keeping up a straight line of fence, in the manner described by the testimony in the case before us, acquired a title to the property now in controversy? And if so, to what extent does this extraordinary fence confer title on its owner? Does it vest in him all filling up that may be caused by it, either immediately or remotely; to the north or to the south; to the east or to the west? Nay, it is relied on, as not only giving title to *William Inloes*, but to all the other defendants, who hold their lots by separate leases, wholly unconnected with, and independently of, *William Inloes*. Upon what ground this reliance is placed, it would be difficult to conjecture. If, in virtue of this fence, a deed is to be presumed to *Inloes* from the owner of the water rights of *Mountenay's Neck*, (which rights, the raising of the present question of course concedes,) then is he entitled to the entire improvement, in dispute, to *Lancaster* street, to the utter exclusion of his co-defendants. In making this fence, *Inloes*, according to the proof, never designed to do more than extend and fill up his own lot; and upon no conceivable principle could any presumption of a deed cover more than the extension in front of his own lot, which would leave his co-defendants wholly unprotected against the claim of the plaintiff, by any presumptive bar, from ancient, continuous, adversary possessions. But suppose it were conceded, that the lines of *Mountenay's Neck* did, by their original location, embrace the land now in controversy, would that enable the defendant *Inloes* to hold it upon the principle of the presumption of a deed to him? The only ground for such a presumption rests on the construction and continuance of his fence, as stated by the witnesses. This fence, it will be borne in mind, at neither end, nor at any part of it, touched his enclosures or soil, nor was it connected with any thing, natural or artificial, which could render it an enclosure or possession of any thing more than

the ground which the fence itself covered.   In its original con-
struction, it was  nothing  more than  a mere trespass, and  its
subsequent repairs were, as well in fact as in law, but repeated
trespasses.    In 3 *Harr. & McH.* 621, *Davidson's lessee vs.
Beatty,* the court say, that, "where a person  shows title to a
tract of land, as for instance, *Black Acre,* and is in possession
of part, possession of part is possession of the whole."   And
in  such a case, "where a person  claims by possession  alone,
without showing any title, he must show an exclusive, adverse
possession by enclosure, and  his claim cannot extend beyond
his enclosures."   "Where two are in  possession of a tract or
a house, it is his possession, who has the right."   In *Chaney
vs. Ringgold's lessee and al,* 2 *Harr. & John.* 87, this court
say, "when two are in mixed possession of the same land, one
by title, and the other by wrong, the law considers him, hav-
ing the title, as in possession to the extent of his rights."   And
in *Hall vs. Gittings,* 2 *Harr. & John.* 112, that "where two
persons are in  possession of land, the one by right, and  the
other by wrong, it is the possession of him who is in by right."
The Supreme Court of *New York* have decided, in *Jackson vs.
Camp,* 1 *Cowen,* 609, that, "entry under claim of title, is gen-
erally sufficient to constitute an  adverse possession, and  it is
not. immaterial whether the title be valid or not."   "But if
claim is not founded on a deed or writing, the possession  is
limited to actual occupancy and substantial enclosure, definite
and notorious."   And in *Jackson, &c., vs. Schoonmaker,* 2
*Johns.* 230, that "to make out an adverse possession in eject-
ment, the defendant must show a substantial enclosure, an
actual occupancy, definite, positive and notorious; it is not
enough to make what is called a possession fence, merely by
felling trees and lapping them one upon another round the
land."   Upon the principles of these adjudications, how can
it be contended, that simply upon the possession arising from
*Inloes'* fence, you are to presume a conveyance (as far as the
fence indicates, of indefinite extent,) of the land lying to the
north, south, east and west of it?   And such conveyance is
to ˙be presumed, not only to *Inloes* himself, but to all other

lessees, deriving distinct and independent titles from the lessor of *Inloes*. As authority against the raising of such a presumption, see the case of *Lessee of Potts vs. Gilbert*, 3 *Wash. C. C. Rep.* 475.

The extent to which lot owners may make their improvements, in reference to each other, under the act of 1745, cannot, at this time of day, be a subject for contest. In *Dugan and al vs. The Mayor and City Council of Baltimore*, 5 *Gill & John.* 367, this court declared that this Act of Assembly vests, in the improver, no title to improvements not made pursuant to the provisions thereof. That "the improvements, authorised and encouraged, were those made by improvers in front of their own lots, not of their neighbors. The legislature never designed such an invasion of the rights of private property; nor, indeed, had they the power to legalise it, if such had been their design." A similar construction had been previously given to the act of 1745, in *Harrison vs. Sterett*, 4 *Harr. & McH.* 550.

The right of extending her lot, or wharfing out to the city dock, under the act of 1745, and the ordinances of the city of *Baltimore*, was a franchise; a vested right, peculiar in its nature; a *quasi* property, of which the lessor of the plaintiff could not lawfully be deprived, without her consent. And if any other person, without her authority, made such extension, no interest or estate in the improvement vested in the improver, but it became the property and estate of the owner of the franchise. The fact that the improvement was made by the city officers or agents, and paid for by the defendants, does not at all vary the case, or change the relative rights of the parties, as was correctly decided by this court in the case of *Wilson vs. Inloes*, 11 *Gill & John.* 351.

On the part of the defendants, it has also been contended, that *Mrs. Casey*, and those under whom she claimed, having stood by and seen *Inloes* expend his money in erecting his fence and repairing the same, on the property now in dispute, and giving no notice of her or their title to the same, are ever after precluded from asserting their rights to the prejudice of *Inloes*,

and those claiming under him. But there is no ground for such a defence in this case. The plaintiff's right to the privilege in controversy, must be presumed to have been as well known to *Inloes,* as to the plaintiff, and the giving of notice would have been an act of supererogation. The true doctrine applicable to such cases, was decided by the court in the case of *Gray vs Bartlett,* 20 *Pick.* 186, that where one stands by and sees another laying out money upon property, to which he himself has some claim or title, and does not give notice of it, he cannot afterwards, in equity and good conscience, set up such claim or title, does not apply to an act of encroachment on land, the title to which is equally well known, or equally open to the notice of both parties; but the principle applies only against one, who claims under some trust, lien or other right, not equally open and apparent to the parties, and in favor of one who would be misled or deceived by such want of notice.

The *sixth* prayer asks the court to instruct the jury, "that the defendants cannot be allowed to avail themselves of any possession, so as to defeat the title of the plaintiff, further than such possession is located on the plats in this case." And in refusing it, we think there was error: it being a well established principle of the ejectment law of *Maryland,* that where defence is taken on warrant, all possessions, whether relied on to prove title, for illustration, or to disqualify witnesses examined on the survey, must be located on the plots in the cause.

In refusing the *seventh* prayer of the plaintiff, (which is, "that the acts and possession of any one of the said defendants, cannot avail the other defendants, by affording to them the benefit of a presumption of a grant,") we think the county court also erred. There is no evidence to shew any possession in any person, under whom two or more of the defendants claim to derive title; but on the contrary, they all claim title under separate and independent leases. There is no privity of any kind between them. They all possess distinct rights of extending their respective lots into the water. How then can the presumption of a grant, founded on the long continued

possession of the owner of one lot, enure to the benefit of the owner of a separate and distinct lot, of which no such possession had ever been held?

We approve of the county court's refusal of the *eighth* prayer, "that before the jury can find a title in the defendants, or any one of them, by presumption of a grant from the plaintiff, or those under whom she claims, they must believe in their conscience, and find as a fact, that such grant was actually made." The granting of such a prayer would have had a tendency to mislead the jury, by inducing them to believe that the presumption of a grant could not be made, unless the jury, in point of fact, believed in the execution of the grant; whereas, it is frequently the duty of the jury to find such presumption, as an inference of law, although in their consciences they may disbelieve the actual execution of any such grant.

The *ninth* prayer was properly refused, not only for the reason we have stated in support of the refusal of the eighth prayer, but because it confined the jury to the finding of a deed executed by the plaintiff herself, and would have precluded them from finding, if the proof had warranted it, a deed from any of the grantors, under whom she might claim.

The *tenth* prayer, we think, ought to have been granted for the reasons stated by us in the consideration of the court's refusal of the fifth prayer.

The *eleventh* prayer also, the county court should have granted. The possessions of the defendants on the east side of *Caroline* street, not interfering with or being adverse to any of the rights of the plaintiff, or those under whom she claimed, could form no basis for the presumption of a deed for the property in dispute, which lies wholly on the west side of *Caroline* street. That the title of the rightful owner, in a case of mixed possession, (which is the most favorable condition in which the defendants can be regarded,) cannot be barred "by adding together the different possessions and acts of the defendants, at long intervals, in point of time, so as to make out twenty years," is a principle too well settled to require a reference to authorities to sustain it. Upon every discontinuance

Casey's lessee *vs.* Inloes, et al.—1844.

of the possession of the wrong-doer, by operation of law, the possession of the rightful owner is restored: and nothing short of an actual, adverse and continuous possession for twenty years, can destroy his rights, or vest a title in the wrong-doer.

The *twelfth* prayer too, we think, should have been granted, as well from the nature of the plaintiff's rights, to which the statutory bar is attempted to be interposed, as the total insufficiency of the possession and acts relied on as constituting the bar.

The *thirteenth* prayer is as follows: "If the jury find the patents, deeds and ordinances, offered in evidence in this cause, by the defendants, and that they were so offered by the defendants to show that they had the superior, better and more ancient right to extend, fill up and improve in front of their own lots, than the plaintiff, and those under whom she claims, have in front of her lot, then no possession which has been proved in this case on the part of the defendants, or any of them, can give rise to a presumption of a grant to the defendants from the plaintiff, as the claim of a better title on the part of the defendants than the plaintiff ever had, if the jury find that such claim is wholly inconsistent, and at war with such presumption." In refusing this prayer, the county court, we think, were right for two reasons. First, because it requires the court to instruct the jury, that if the patents, deeds and ordinances were offered to shew a claim to a superior title in the defendants, then they cannot presume a deed to the defendants, because such claim is inconsistent with such presumption; although, for aught that appears in the prayer, the jury might believe, that at the date, and during the continuance of the possessions and acts of the defendants, they the defendants had no knowledge of such their claim to a superior title, and did not rely on it, but held the possession, and did the acts referred to, under a knowledge and admission of the original superiority of the title of the plaintiff, and those under whom she claims; and that the defendants claimed to hold their possession in virtue of a deed to them from the plaintiff, or those under whom she claimed. The author of the prayer doubtless

designed that the court's instruction should have been given upon the assumption that the possession and acts of the defen-dants were the result of their claim of original superiority of title, but such was not the state of facts, on which the instruc-tion was refused by the court. And secondly, we approve of the court's rejection of this prayer, even if it had been pre-sented upon the statement of facts, on which, we presume, it was designed to have been based. When a court, as an infer-ence of law, arising from proof of possession, directs a jury to presume a deed, it is done, upon the principles of public policy, for the protection of ancient possessions, not upon the ground that it believed that the deed presumed ever had an existence in point of fact, or that the party relying on such possession, either at its commencement, or during its continu-ance, claimed to hold under any such deed, or was silent as to the claim under which he held. The inference of law would be the same; the court would direct the jury to make the same presumption. All that the law requires to raise the presump-tion, is, that the possession should have been actual, adverse, exclusive and continuous, and under claim of title. If the pre-sumption of the deed was a matter of fact, which the jury were only authorised to find on their belief of its existence, and the evidence of possession, which was the basis of the pre-sumption, was taken and held under claim of a distinct and different title, then it would be competent for the court to in-struct the jury, that there was no evidence whereon the exist-ence of such a deed could be presumed.

The *fourteenth* prayer was properly rejected by the court below. It called on the court to instruct the jury as to the effect of the patent of a tract of land called *"Fell's Prospect,"* which was neither located upon the plots, nor given in evidence to the jury. It also asked the court's instruction to the jury, that the defendants cannot claim under the patent of *"Island Point,"* as a subsisting independent patent, but they must claim, if at all, by the relation to it, of the patent of *"Fell's Prospect;"* a prayer which this court could not grant, as *Long Island* was not only granted under the alleged patent of *"Fell's*

64    v.1

*Prospect*," to *Edward Fell*, under which the defendants claim title, but was devised to *Edward Fell* by the last will and testament of his father *William Fell*, in 1746, to whom *"Island Point"* was granted, by patent bearing date in 1734.

The *fifteenth* prayer demanded an instruction, "that even if the jury should believe from the evidence that, *Thomas Sligh* claimed under the escheat patent of *Mountenay's Neck* to *Edward Fell*, (meaning *William Fell*,) in the year 1737, still the said *Thomas Sligh*, and those claiming under him, have a right to go back, by relation, to the original patent of *Mountenay's Neck* in 1663, and to date their title from that period." In opposition to this prayer, a variety of grounds have been strongly urged. First, it is insisted that an escheat grant creates *"feudum novum,"* operating only from its date, independently and unconnected with the original grant, and that the doctrine of relation has no application to such grants; that upon the failure of the heirs of the first grantee, or the occurrence of other cause of escheat, the land vested in the Lord Proprietary, or vests in the State, since the organization of our State Government, as a part of the public demesne, and is held by the Lord Proprietary, or the State, and the escheat grantee, as if no previous grant had ever been made of it. We do not deem it necessary to examine the various authorities referred to, as shewing the character in which the Lord Proprietary or State acquires, or the nature of the interest acquired in, lands liable to escheat. Sir *William Blackstone*, in the 2nd *volume of his Commentaries, p.* 245, in speaking of the title which the Lord of a Seignory acquires by an escheat, says: "Sir *Edward Coke* considers the lord by escheat, as in some respects the assignee of the last tenant, and therefore taking by purchase; yet, on the other hand, the lord is more frequently considered as being *ultimus hæres*, and therefore taking by descent, in a kind of caducary succession." And in *Matthews vs. Ward's lessee*, 10 *Gill & John.* 451, this court have said: "In analogy, therefore, to the admitted condition of allodial property, and in conformity to the reason and justice of the thing, when the owner of real estate dies without heir,

the State is *ultimus hæres*, and takes the property for the benefit of all." *Ultimus hæres*, of what, did *Sir Edward Coke*, or this court mean? Assuredly, of that to which the person was entitled, whose death, without heirs, created the escheat. An escheat grant, in one sense of the term, is the creation of a *feudum novum:* that is, the grantee takes the property granted, as a new *fief* or *feud*, as regards his relationship, obligations and duties to the State. And what may be said of the State, is true as to the Lord Proprietary. He takes the estate granted upon the terms specified in the grant. But what is the estate granted? What are its limits, privileges, appurtenances, and priorities? To what liens and incumbrances it may be subjected, are matters existing independently of the inquiry, whether the grant be of a *feudum novum, aut antiquum.* When the State acquires title to land by escheat, it is not thereby invested with that, only, which it originally granted, and nothing more or less. It is invested with all the rights, privileges, priorities and appurtenances incident to the land itself, and with which it was held by the person, by reason of whose default of heirs, it had become escheat. The State, thus succeeding to the rights of such person, takes the property subject to all liens and incumbrances imposed upon it by him, or those under whom he derives title. And the escheat grantee, upon the terms specified in his grant, takes the estate granted, in the same condition in which it may have devolved on the State, except so far as it may be affected by the doctrine of merger or extinguishment.

To prove that an escheat grant does not relate to the original grant, and pass to the escheat grantee all that passed to the original grantee, and which was held by him, whose death, without heirs, occasioned the escheat, no authority has been referred to. And that the reverse is the well settled law of *Maryland*, appears by reference to the case of *Hall vs. Gittings*, 2 *Harr. & John.* 112, where the court say: "An escheat grant relates to, and operates to pass, the whole of the original tract escheated." And to the case of *Howard vs. Moale*, 2 *Harr. & John.* 250, where "the court refused to direct the jury, that

an escheat grant did not include any land included in the original grant, except the same was included within the metes and bounds of the escheat grant, as particularly described; and that the escheat grant did not, by legal operation, convey all the land included within the original grant, unless the particular metes and bounds of the escheat grant did also include the same:" and said that "a grant for escheat land will relate back to the original grant." And that "an escheat certificate and grant do, by operation of law, relate to the original tract, and is strictly within the principle and rule of law of relation between grants and certificates." The same doctrine will be found in *Dorsey on Ejectment*, 78.

But it is insisted on the part of the appellees, that, conceding *Mountenay's Neck*, the original, to have carried with it the title to the property now in controversy, by the escheat grant to *William Fell*, of "*Island Point*," in 1734, this title or franchise was granted to *William Fell*, and became appurtenant to *Island Point*, under whom the appellees claim. Without inquiring whether, under any state of circumstances, such could be the effect of the escheat grant of *Island Point*, let us see whether such could be the construction of that grant, even conceding, that in terms it had embraced land included within the limits of *Mountenay's Neck*. The appellees first insist, that although it should be conceded that *Mountenay's Neck* was not liable to escheat in 1734, when the patent for "*Island Point*" issued; yet, that the Lord Proprietary is estopped from denying that it was so escheatable, and that whether then escheatable or not, is a matter of no importance, as the grant passed the contingent or possible right of acquiring the property by escheat, which right was then in the Lord Proprietary. And in support of the latter proposition, the case of *Bladen's lessee vs. Cockey*, 1 *Harr. & McHen*. 230, has been referred to, as shewing that the relation of an escheat grant to the original grant, shall not defeat an intermediate grant, including the lands contained in the original grant. In the regular report of that case, no such question appears to have been decided by the Provincial Court or Court of Appeals. But the reporter

appends "a note of *Samuel Chase, Esq.*, then a practising attorney or the Provincial Court," stating, "it has been determined that the relation of an escheat to the original certificate, shall not defeat mesne lawful grants. This was the case of *Bladen's lessee vs. Cockey*, (about October 1776,) the substance of that case was as follows: a tract of land called "*Carse's Forest*," was originally granted to *Robert Carse*, in 1696. It was granted to *George Stewart* as escheat in 1746. In June, 1721, the same land was granted to *John Cockey*, by the name of "*Cockey's Folly.*" The question was, whether the grant to *Cockey* in 1721, was not an elder title than the escheat grant to *Doctor Stewart* in 1746, under whom *Bladen* claimed. Whether "*Carse's Forest*" was escheatable in 1721 or not, does not appear. If it were, then was the decision, imputed to the Provincial Court, in perfect accordance with subsequent decisions in this State upon like questions. But if the fact were otherwise, then must we express our decided dissent from this alleged decision of the Provincial Court. Until the occurrence of the event which constitutes the escheat, the interest of the Lord Proprietary, in relation to it, was a mere possibility, and could not be the subject of a grant. Such in effect was the decision in the case of *Partridge's lessee vs. Colegate*, 3 *Harr. & McHen.* 340. And in *Hall vs. Gittings*, 2 *Harr. & John.* 112, the court say, "escheat is that possibility of interest which reverts to or devolves on the Lord, upon failure of heirs, of the original grantee, and he cannot grant the land again until that event happens; and if he does, his grant will pass nothing:" and land not liable to escheat at the time it was included in a grant on a survey made in virtue of an escheat warrant on another tract, but which afterwards became escheat, will not pass under such grant, and the State is not estopped from granting it to any other person." And in *Howard vs. Moale*, 2 *Harr. & John.* 250, the court decided, that "a grant of land, surveyed under a common warrant, will not pass land not then liable to escheat, but which afterwards became escheat, and as such was granted to a third person." But apart from these decisions, the inapplicability of the doctrine of estoppel

to grants of land made by the State or Lord Proprietary, is clearly shown in *Codman and others vs. Winslow,* 10 *Mass. Rep.* 155. Such grants and patents issue upon the statement of facts made by the grantees, and the recitals and assumptions of facts, therein contained, are, in fact, but the suggestions of the grantees. In such grants or patents, nothing passes but the title which the grantor then possessed, not that subsequently acquired.

But it is urged by the appellees, that conceding the law to be, as we have stated it, that it does not apply to *William Fell's* patent for "*Island Point,*" in 1734, because "*Mountenay's Neck*" was then liable to escheat, of which liability, the only evidence offered, is the escheat warrant and patent to *William Fell,* of *Mountenay's Neck,* in 1737. An escheat grant is *prima facie* evidence that the land granted is liable to escheat. But liable at what time? At the date of the issuing of the escheat warrant, and not antecedently. The escheat warrant for "*Mountenay's Neck,*" which issued in April 1737, is no evidence of its liability to escheat in 1734.

Suppose, however, we are wrong in the views we have taken of the operation of the grant of "*Island Point,*" in 1734, and that it passed to the patentee a portion of "*Mountenay's Neck,*" or of the franchises incident to it; of what avail is it to the appellees? *William Fell,* by the patents of 1734 and 1737, being entitled to both tracts of land, and his devisee, *Edward Fell,* having, by his deed of 1758, conveyed "*Mountenay's Neck*" to *Thomas Sligh,* it passed to him, with all its appurtenances, in the same manner that it was held under the original patent of 1663. See the case of *Mundell vs. Perry,* 2 *G. & J.* 193.

As far as regards any conflict of rights between these parties, *Inloes* and the other defendants had, under the act of 1745, a right to extend westwardly, in front of their lots, to the line of the eastern end of the *City Dock,* extended northwardly; that is to say, to the west side of *Caroline* street, and no farther; and the lessor of the plaintiff had the right to extend her grounds to the *City Dock,* at the south side of *Lancaster*

street. Upon the aforegoing views, this court think that the plaintiff's fifteenth prayer ought to have been granted.

The court below erred in granting the plaintiff's *sixteenth* prayer, upon the grounds stated by us in the examination of the propriety of its granting the plaintiff's first prayer in the third bill of exceptions.

We concur with the county court in their refusal to grant the defendants' *second* and *third* prayers, and dissent from its granting the defendants' *fourth* prayer in the third bill of exceptions, upon the grounds we have stated in reviewing the court's opinions upon the various prayers of the plaintiff, contained in that exception.

And we concur with the rejection of the *second* and *third* prayers for an additional reason. In those prayers, they put to the jury the finding of certain facts, none of which relate to the acquirement of title by the defendants in virtue of possession; and these prayers are predicated upon the assumption, that the defendants had shewn a clear paper title to their several lots, by means of which they assert a title to the property in dispute. But this assumption of title is wholly unsustained by the evidence before the jury. They severally claim title to their respective lots under leases from *Ann Fell*, who, by the record, is not shown to have had any title to the lots attempted to be leased. And, waiving this defect, which, of itself, is an insuperable objection to the court's instructing the jury that the defendants are "the elder riparian owners of the water lots on *Bond* street," the court could not have granted the prayer, because the only evidence to show *William Inloes* (apart from his possession,) was entitled to lot number *five*, was, that he was the heir of *Abraham Inloes*, the lessee for a term of years.

The *first* prayer of the defendants, "that if the jury find that the tract of land called "*Bold Venture*," was granted as given in evidence by the defendants, and that the same is truly located on the plats in the cause by defendants, that then the patent of "*Mountenay's Neck*" gives no title to the lessor of the plaintiff to the lot of ground for which the defendants have taken the defence on the plats," we think ought to have been

granted. *"Bold Venture,"* embracing all the land between the line of *"Mountenay's Neck,"* from M to N, and the City Dock, covers of course, the ground now in controversy, as effectually as if it had been fast land, at the time the *"Bold Venture"* was originally surveyed. The act of 1745, ch. 9, never was designed to give one land-holder the power of extending his improvements over the land of another. If such had been the design of the legislature, it possessed not the power of effecting it, in the mode provided by that Act of Assembly. The grant of *"Bold Venture,"* though for the most part covered with water, still passes to the grantee all the soil, under the water, included within its outlines, with all the rights of property incident thereto, subject only to the rights of the public, as to fishing and navigation. If it had been encroached on by any person, as by driving of piles and erecting a wharf, or building a house thereon, an action of trespass or ejectment could have been maintained by the patentee, or those claiming under him. See the case of *Brown vs. Kennedy,* 5 *Harr. & John.* 210.

Upon the views we have expressed in relation to *"Bold Venture,"* we could not do otherwise than approve of the county court's refusal to grant the plaintiff's second prayer in the third bill of exceptions.

From what we have said in relation to the three preceding bills of exceptions, it follows, that we dissent from the county court's refusal to grant the four first prayers of the plaintiff in the fourth bill of exceptions; but concur with it in its refusal of the fifth and sixth prayers of the plaintiff.

As *"Bold Venture"* bars the plaintiff's recovery as against any of the defendants, we approve of the county court's refusal to grant the plaintiff's prayer in the fifth bill of exceptions.

No ground of error has been suggested to us, and we have discovered none, in the court's admitting the testimony objected to by the defendants in the sixth bill of exceptions.

We approve of the acts of the court in the first and second bills of exceptions, and of their refusal to grant the plaintiff's second, eighth, ninth, thirteenth and fourteenth prayers, and

the defendants' second and third prayers in the third bill of exceptions, but we dissent from the court's granting the first and sixteenth prayers of the plaintiff, and its refusal of the plaintiff's third, fourth, fifth, sixth, seventh, tenth, eleventh, twelfth and fifteenth prayers, and the defendants' first and fourth prayers in the said exception; and concur with the court in its refusal of the four first prayers of the plaintiff in the fourth bill of exceptions, and dissent from its refusal of the plaintiff's fifth and sixth prayers; and we concur with the county court in its refusal of the plaintiff's prayer in the fifth bill of exceptions, and also with its overruling the defendants' objection to the testimony mentioned in the sixth bill of exceptions.

**JUDGMENT REVERSED AND PROCEDENDO AWARDED.**